**IN THE UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **THOMAS J. BONASERA, ADMINISTRATOR OF THE ESTATE OF ALAINA NICOLE STEELE, DECEASED,**<br><br>PLAINTIFF,<br><br>v.<br><br>**PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY dba PENN NATIONAL INSURANCE,**<br><br>and<br><br>**W.D. WRIGHT CONTRACTING, INC.,**<br><br>and<br><br>**NEW RIVER ELECTRICAL CORP.,**<br><br>DEFENDANTS. | Case No. 2:19-cv-03817-EAS-CMV<br><br>JUDGE EDMUND A. SARGUS, JR.<br><br>MAGISTRATE JUDGE CHELSEY M. VASCURA<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT NEW RIVER ELECTRICAL CORP.'S MOTION TO DISMISS** |

Plaintiff Thomas J. Bonasera, Administrator of the Estate of Alaina Nicole Steele, deceased, submits his opposition to Defendant New River Electrical Corporation's ("New River") Motion to Dismiss Plaintiff's Amended Complaint under Fed. R. Civ. P. 12(b)(6). ("Motion," ECF No. 14).  Defendant New River contends that the Amended Complaint fails to allege that it owed a cognizable duty to decedent Alaina Steele.  But under well-established law in Ohio, Plaintiff's Amended Complaint sufficiently alleges a negligence claim against New River because it sets forth well-pleaded facts that New River "actively participated" in the events that resulted in Alaina Steele's death.

1

I.      **INTRODUCTION AND FACTUAL BACKGROUND**

    A.    **Decedent Alaina Steele's and Her Niece Samantha Steele's Hiring and Training by Defendant W.D. Wright and/or Wright Brothers.**

On August 11, 2017, decedent Alaina Steele was struck and killed by a motorist while she and her niece Samantha Steele were performing traffic control services ("flagging") for Defendant New River.

About two months earlier, on June 14, 2017, Alaina and Samantha Steele applied for flagging positions with Defendant W.D. Wright Contracting, Inc. ("W.D. Wright") and/or Wright Brothers, Inc. ("Wright Brothers") and were hired. (ECF No. 8, ¶¶ 24-27.) On June 22, 2017, Alaina and Samantha Steele went to the Columbus office that Defendant W.D. Wright and Wright Brothers shared to take a flagger certification class that lasted three hours and a certification test that took ten minutes. (*Id*. at ¶¶ 31, 36.)

On July 5, 2017, Alaina and Samantha Steele met two individuals employed by Defendant W.D. Wright and/or Wright Brothers for "on-site training" at a "job yard," a place nearby the worksites where equipment used for the job is stored and where workers typically meet before and after working each day. (*Id*. at ¶¶ 42-44.) This "training" consisted of the two company employees observing, from inside a vehicle, Alaina and Samantha Steele set up six road signs and practice flagging for four hours. (*Id*. at ¶¶ 42-50.) The two W.D. Wright and/or Wright Brothers employees did not monitor, instruct, or critique Alaina and Samantha Steele while they practiced flagging. (*Id*. at ¶ 49.) According to the "Wright Policy Manual," Alaina and Samantha Steele would have a 90-day "introductory period" for their employment. (*Id*. at ¶ 49.)

From July 6, 2017 to August 2, 2017, Alaina and Samantha Steele worked together on flagging assignments for several different companies, prior to beginning an assignment for New River on August 3, 2017. (*Id*. at ¶ 62.)

> **B.     Defendant W.D. Wright's and/or Wright Brothers's Unsigned "Proposal" or "Quote" to Provide Traffic Control Services to Defendant New River.**

Sometime before Alaina and Samantha Steele began their flagging assignment for New River, W.D. Wright and/or Wright Brothers allegedly sent a letter dated April 24, 2017 to Defendant New River.[1] (ECF No. 8, Ex. 1.) In its header, the letter contains the word "Wright" and the business address for W.D. Wright and Wright Brothers. (*Id*.) The letter notes that it is "Quote # 17176" and that it is a "proposal to provide traffic control services for [New River Electrical Corporation]."[2] (*Id*.)

The letter set forth the "Daily Rate & Timeframe" for services, including "Wright's": "hourly rate;" "normal working hours;" the "time plus one half rate;" charges for "additional hours;" "travel time" charges; "minimum" time charges; and "set up and breakdown of work zone" charges. (*Id*.) It also sets forth "Training & Equipment," representing that: (1) the flaggers are "ATTSA certified and fully trained by W.D. Wright Contracting, Inc. following specifications of the MUTCD manual and the ATTSA;" (2) flagging crews are dispatched as "2 person crews, unless otherwise instructed;" (3) "crews are fully equipped with all required safety apparel . . . .;" (4) "Rate also includes one Wright traffic control vehicle with the following: 30 DOT Approved Safety Cones; 6 Dot [sic] Approved Reflective Signs; 2 Reflective Stop/Slow Paddles;" and (5) "Arrow Boards are available at an additional cost of $10 per hour." (*Id*.) The letter concludes, "If you accept this proposal, please sign below and return via email." (*Id*.) New River does not

---

[1] Defendant New River attached this letter to its motion to dismiss the original complaint (ECF. No. 5) filed on September 10, 2019, the first time Plaintiff was aware of it. Plaintiff attached the document to his Amended Complaint (ECF. No. 8, Ex. 1), and New River attached it to its motion to dismiss the Amended Complaint. (ECF No. 14, Ex. 1.)

[2] Defendant New River represents that this document is actually a "contract" between "New River/W.D. Wright." (ECF No. 14 at 5.) Because the document is on "Wright's" letterhead, includes the terms "quote" and "proposal," and is not signed by New River, this Court may not presume that it is a contract at this stage.

3

state or provide evidence that this document was ever signed and returned to "Wright."

    **C.    Decedent Alaina Steele and Samantha Steele's Flagging Assignment for Defendant New River.**

On August 3, 2017, a W.D. Wright and/or Wright Brothers employee texted Alaina and Samantha Steele informing that they would start a new assignment flagging for Defendant New River that day. (ECF No. 8 at ¶ 64.) New River was performing work on electrical poles located on a two-lane, hilly, rural road near Newark, Ohio that ran north and south. (*Id*. at ¶¶ 62, 115.) When Alaina and Samantha Steele arrived for their first day of flagging, they noticed that New River employees were doing the flagging themselves because the prior flagger for Wright Brothers and/or W.D. Wright had walked off the job. (*Id*. at ¶ 70.) Alaina and Samantha Steele flagged at New River's worksite the remainder of the day. (*Id*. at ¶ 71.)

Robert Phillips was employed by New River and the foreman in charge of New River's worksite; he maintained control over Alaina and Samantha Steele's flagging work. (*Id*. at ¶ 72.) Mr. Phillips informed Alaina and Samantha Steele what poles New River would be working on the following work day, determining the area where the flagging signs would be set up. (*Id*. at ¶ 73.) Mr. Phillips was in charge of New River's worksite and had control over Alaina and Samantha Steel's flagging work: he told them when to begin work, when to take a lunch, when it was time to stop working, when and where to move the flagging signs, and when and where to flag. (*Id*. at ¶ 72.) Alaina and Samantha Steele understood that they were required to follow all of Mr. Phillips's instructions. (*Id*.) From the face of the "Wright" proposal or quote, it is clear that New River determined that a two-person flagging crew was appropriate for its worksite and no Arrow Board was required. (ECF No. 8, Ex. 1.) And New River specifically chose not to have a police escort present at its worksite for Alaina and Samantha Steele's safety. (ECF No. 8 at ¶ 110.)

On each day working at New River's worksite, Alaina and Samantha Steele placed three

road signs on one end of the site and three on the other, all six on the shoulder of the road, based upon Mr. Phillips's instructions as to the location of the job site given the previous day. (ECF No. 8 at ¶ 73.)  After the signs were in place, Alaina Steele parked the vehicle Wright Brothers and/or W.D. Wright provided them[3] on the road—in the lane corresponding to the side New River was working on—as instructed by Mr. Phillips. (*Id*. at ¶ 76.) Alaina and Samantha Steele stood at opposite ends of the job site and held signs that said "slow" or "stop" in order to control traffic around the job site, communicating with each other using walkie-talkies. (*Id*. at ¶ 75.)

When the New River employees were finished with work for the day, all employees would leave the worksite, and Alaina Steele and Samantha Steele would retrieve the six road signs. (*Id*. at ¶ 77.)  While placing or picking up the signs, Alaina stopped the Wright vehicle halfway on the grass and halfway on the road, with the white "fog line" running through the middle of the vehicle and one set of tires on the road and the other set just off the road in the grass. (*Id*. at ¶ 78.)  After retrieving all the signs at the end of each work day, Alaina and Samantha Steele would meet Mr. Phillips at New River's job yard to sign a sheet verifying the hours they worked. (*Id*. at ¶ 78.)

On August 11, 2017, Alaina and Samantha Steele arrived at New River's worksite at 7 a.m. They placed the road signs at both ends of the worksite in the location that Mr. Phillips had instructed, on a hilly part of the road where there was a danger of traffic flow. (*Id*. at ¶ 85.) Mr. Phillips chose a worksite that began at the top of a hill and continued down the side of the same hill. (*Id*. at ¶ 85.)  Alaina and Samantha Steele placed a sign on the crest of the hill, a second down the side of the hill, and a third at the bottom of the hill. (*Id*. at ¶ 88.) Alaina Steele and Samantha

---

[3] Until August 9, 2017, the vehicle used by Alaina and Samantha Steele that had been provided by Wright Brothers and/or W.D. Wright was a van with "Wright" across the sides.  Due to a flat tire that day, Wright Brothers and/or W.D. Wright provided a pick-up truck to Alaina and Samantha Steele as a replacement.  Decedent Alaina Steele used this vehicle at New River's worksite on the date of her death.

Steele were the only flaggers on site and New River did not provide a police, escort, or shadow vehicle to assist them. (ECF No. 8 at ⁋ 89.)

At approximately 11:30 a.m., Austin Martinez, a supervisor for Wright Brothers and/or W.D. Wright, stopped by the job site apparently to ensure the signs were in their proper locations and that decedent Alaina and Samantha Steele were flagging properly. (*Id*. at ⁋⁋ 90-91.) This was the first time that anyone from Wright Brothers and/or W.D. Wright had stopped by the New River worksite. (*Id*. at ⁋ 90.) Mr. Martinez drove through the worksite each way. (*Id*. at ⁋ 91.) He did not tell Alaina and Samantha Steele that the worksite location, as chosen by New River, and sign placement were not proper or that signs were dangerously placed on a hill in violation of flagging standards. (*Id*. at ⁋ 91.) Mr. Martinez left the job site around 12:30 p.m., just before decedent Alaina Steele and Samantha Steele were scheduled to retrieve the signs and end their shift.

At approximately 1 p.m., Mr. Phillips instructed Alaina and Samantha Steele to stop work and begin retrieving the road signs. (*Id*. at ⁋ 91.) No one from New River, Wright Brothers, W.D. Wright, or anyone else, was present to supervise or assist Alaina Steele and Samantha Steele retrieve the signs. (*Id*. at ⁋ 94.) Instead, New River and W.D. Wright chose to leave the job site before Alaina and Samantha Steele picked-up the flagging signs. (*Id*. at ⁋ 94.) While retrieving the road signs, Alaina Steele was driving the Wright vehicle south-bound in the right-hand lane with the right-side wheels partially in the grass. (*Id*. at ⁋ 95.) The signs were located near the shoulder of the north-bound land. (*Id*. at ⁋ 95.) Alaina Steele and Samantha Steele first retrieved the first set of signs. (*Id*. at ⁋ 95.) Then, they began retrieving the second set of signs continuing to travel south-bound in the right-hand lane so that no flagger signs were behind them "upstream." (*Id*. at ⁋ 95.) After decedent Alaina Steele and Samantha Steele retrieved the fourth sign (the first sign of the second set of three), the Steeles were just past a hill in the road that obstructed oncoming

6

traffic to their presence. (ECF No. 8 at ¶ 96.)  As decedent Alaina Steele and Samantha Steele approached the fifth of the six signs, decedent Alaina Steele stopped the vehicle and put it in park, but left the vehicle running while they worked together to retrieve the fifth sign. (*Id*. at ¶ 97.)

After they loaded the fifth sign in the back of the pickup truck, Samantha Steele heard a loud noise coming from what sounded like a vehicle traveling south-bound behind the pickup truck. (*Id*. at ¶ 98.)  A Jeep, driven by non-party Rebecca Cook, then came into view over the hill at a high rate of speed in excess of the speed limit. (*Id*. at ¶¶ 98-99.)  After seeing the Jeep, Alaina Steele ran around to the passenger side of the Wright pickup truck (the side partially on the grass) and Samantha Steele ran around the driver side of the Wright pickup truck (the side towards the middle of the road). (*Id*. at ¶ 99.)  The driver of the Jeep, Rebecca Cook, then applied the brake hard, causing her to lose control and the front end of the Jeep to go down towards the ground. (*Id*. at ¶ 100.)  The Jeep then went off the right side of the road, into the ditch, and flipped and landed on Alaina Steele. (*Id*. at ¶ 100.)  Alaina Steele died from her injuries several minutes later after efforts by EMS personnel to resuscitate her at the scene were unsuccessful. (*Id*. at ¶¶ 102-05.)

"After decedent Alaina Steele passed away, her now deceased husband, Mitchell Steele, began communicating with Jessica Wickham, an employee of Wright Brothers and/or Defendant W.D. Wright." (*Id*. at ¶ 108.)  In a written message, "Ms. Wickham informed Mr. Steele that New River chose not to have a police escort at the worksite for the flaggers' safety." (*Id*. at ¶ 110.)  And after Alaina Steele was killed, another flagger from Wright Brothers and/or W.D. Wright was nearly struck by a vehicle at the same New River worksite. (*Id*. at ¶ 109.)  Wright Brothers and/or W.D. Wright terminated its agreement with New River, and no longer allowed its flaggers to do work for New River given the safety concerns with New River and its worksite. (*Id*.)

### D. Occupational Safety and Health Administration Investigation.

After Alaina Steele died, the Occupational Safety and Health Administration ("OSHA") conducted an investigation into her death and its causes. (ECF No. 8 at ¶ 111.) On November 30, 2017, after concluding its investigation, OSHA issued a Citation and Notification of Penalty letter ("OSHA Letter") to Alaina Steele's employer "Wright Brothers, Inc." (*Id*. at ¶ 112.) The OSHA Letter issued one citation to Wright Brothers, Inc. based upon "two items." (*Id*. at ¶ 113.)

> The first "item" was based upon a violation of the OSHA Act of 1970 Section (5)(a)(1):
>
> The employer did not furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees in that employees removing traffic control devices, when there was a danger of traffic flow, were exposed to struck-by hazards.

(*Id*. at ¶ 114.) Specifically, OSHA found:

> [E]mployees were exposed to struck-by hazards while removing temporary traffic control devices from a rural hilly two-lane roadway without employing positive protection or other acceptable means of protection. On or about August 11, 2017, an employee was struck and fatally injured by a southbound vehicle while standing outside the company's work truck after having loaded temporary traffic control devices from the shoulder of the north-bound lane and all upstream south-bound temporary traffic control devices had been removed.

(*Id*. at ¶ 115.) OSHA found that numerous regulations and standards were violated, including those set forth in (1) the Ohio Manual of Uniform Traffic Control Devices, (2) the Federal Highway Administration Manual on Uniform Traffic Control Devices, (3) the American Safety Services Association Field Guide on Installation and Removal of Temporary Traffic Control for Safe Maintenance and Work Zone Operations, and (4) the standards set forth in ANSI/ASSE A10.47 – 2015 Work Zone Safety for Highway Construction. (*Id*. at ¶ 115.) The violations were found "to include, but not limited to: Removing traffic control devices by properly trained employees under the supervision of the traffic control supervisor. Removing traffic control devices starting from the downstream end. When there is a danger of traffic flow, removing traffic control

devices using a 'shadow vehicle.'" (*Id*.)

The second "item" was based upon 29 CFR 1926.21(b)(2): "The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury." (*Id*. at ¶ 117.) Specifically, OSHA found:

> [E]mployees were exposed to struck-by hazards while removing temporary traffic control devices from a rural hilly two-lane roadway without employing positive protection or other acceptable means of protection. The employees had not received training on the procedures for retrieving traffic control signs when dismantling a temporary traffic control zone, had not received training on the hazards limited by the topography of the traffic control zone, and had not received training on the safety measures to be taken to protect themselves such as, but not limited to, the use of a shadow vehicle or police assistance.

There is no indication that OSHA ever considered whether New River violated OSHA regulations or other regulations and standards pertaining to traffic control personnel.

## II. LAW AND ARGUMENT

### A. A Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) Is Disfavored and Rarely Granted.

"A motion to dismiss under Rule 12(b)(6) is disfavored and rarely granted." *Nuchols v. Berrong*, 141 Fed. Appx. 451, 453 (6th Cir. 2005). To defeat a Rule 12(b)(6) motion, the pleading party must only allege "sufficient factual matter, accepted as true, to 'state a claim [for] relief that is plausible on its face.'" *Garcia v. Fed. Nat. Mortgage Ass'n.*, 782 F.3d 736, 739 (6th Cir. 2015) (quoting, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007)). "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009)). Plaintiff's Amended Complaint safely clears this bar.

### B. Defendant New River Owed a Duty of Care to Alaina Steele Because It Actively Participated in the Events that Caused Her Death.

The Amended Complaint pleads a wrongful/death negligence claim against New River that is plausible on its face. The Amended Complaint alleges that New River "actively participated" in the events that caused Alaina Steele's death by making decisions that affected the safety at its worksite, including: (1) choosing not to have a police or escort vehicle; (2) directing Alaina and Samantha Steele's flagging activities; (3) choosing to have a two person crew, not to have a sign board, and other safety decisions that contributed to Alaina Steele's death; and (4) failing to ensure a proper temporary traffic control plan was in place. These allegations are not "conclusory" or "speculative," as Defendant New River claims, or based upon "fabricated" facts.[4] Instead, they are alleged with sufficient factual content upon which the court may draw a reasonable inference that New River is liable.

Under Ohio law, "in order to establish 'actionable negligence' three essential elements must be shown, namely, [1] a duty or obligation on the part of the person charged with such negligence to protect another from injury, [2] a failure to discharge that duty, and [3] an injury to such other proximately resulting from such failure." *Wellman v. East Ohio Gas Co.*, 160 Ohio St. 103, 108-09, 113 N.E.2d 629 (1953). As New River correctly notes, *Wellman*, decided by the Ohio Supreme Court in 1953, set forth the rule applicable *at that time* that "[w]here an independent contractor undertakes to do work for another in the very doing of which there are elements of danger, no liability ordinarily attaches to the one who engaged the services of the independent

---

[4] *See* New River's Motion at 15-16. New River's inflammatory and reckless contention that Plaintiff has "fabricated" allegations in the Amended Complaint without providing evidence should be disregarded and met with disapproval by this Court. Curiously, New River makes this allegation on a motion to dismiss that ultimately seeks to *avoid* any discovery in this case—a process that would determine whether New River can back up its bold claim. Plaintiff, on the other hand, embraces the opportunity to engage in mutual discovery to prove his case and demonstrate the well-grounded basis for his allegations.

contractor." *Id*. at syllabus ¶ 3. In 1983, the Ohio Supreme Court announced an exception to the *Wellman* doctrine, now widely applied by Ohio courts, "by holding that one who hires an independent contractor, actually participates in the subcontractor's job and fails to remove a hazard that could have been removed with ordinary care can be held liable for the death of an employee of that independent contractor." *See Abbott v. Jarret Reclamation Srvc., Inc.*, 132 Ohio App. 3d 729, 739, 726 N.E. 2d 511 (7th Dist. 1999) (citing *Hirschbach v. Cincinnati Gas & Elec. Co.*, 6 Ohio St. 3d 206, 208, 452 N.E.2d 326 (1983)).

Under the *Wellman* doctrine exception, to establish a general contractor's liability for injuries suffered by an employee of an independent subcontractor, the employee must show the general contractor's "active participation" in activity causing the injuries meaning, more precisely, that "the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project." *Bond v. Howard Corp.*, 72 Ohio St. 3d 332, 337, 650 N.E.2d 416 (1995). Examples of a general contractor's acts that support a finding of "active participation" include directing the activities of the independent contractor's employee, instructing the independent contractor's employee on what safety equipment to use, and instructing the independent contractor's employee where to conduct her activities. *See Abbott*, 132 Ohio App. 3d at 737, 753 (granting a directed verdict to defendant-general contractor on the element of duty, *after* denying defendant-general contractor's motion for summary judgment and after full presentation of plaintiff's case to the jury). Here, New River agrees that this standard applies to its relationship with Alaina and Samantha Steele. (ECF No. 14 at 18.)

### 1. New River Actively Participated in the Events Leading to Alaina Steele's Death by Deciding Not to Have a Police or Vehicle Escort at Its Worksite.

New River chose not to have a police escort at the worksite, a decision that compromised Alaina Steele's safety. The Amended Complaint alleges W.D. Wright informed Alaina's now-deceased husband Mitchell Steele that New River chose not to have a police escort at the worksite for the flaggers' safety. Because this is a concrete, well-pleaded allegation, the Court must presume that it is true. *See Garcia*, 782 F.3d at 739.

New River's decision not to have a police escort or other vehicle escort at the worksite qualifies as active participation in the events leading to Alaina Steele's death. *See Abbott*, 132 Ohio App. 3d at 741 (affirming directed verdict in favor of general contractor on plaintiff's active participation theory in a trench collapse case because the general contractor did not "direct [decedent's] previous trenching activities nor did it direct or help excavate the October 29, 1992 trench," did not "tell [the independent contractor] what safety or excavation equipment to use and did not tell [the independent contractor] how or exactly where to dig the trench.")

This underlying failure forms, in part, the basis of the violations set forth in OSHA's November 30, 2017 Citation and Notification of Penalty letter. In its letter, OSHA found: "[E]mployees were exposed to struck-by hazards while removing temporary traffic control devices from a rural hilly two-lane roadway without employing positive protection or other acceptable means of protection." (ECF No. 8 at ¶ 115.) According to OSHA's letter, the acceptable means of protection included "the use of a shadow vehicle or police assistance." (*Id*. at ¶ 116.) This safety feature was a "feasible and acceptable means of abatement" of the "hazards that were causing or likely to cause death or serious physical harm" to Alaina Steele. (ECF No. 14, Ex. 2 at 4.) Yet New River specifically rejected the use of police assistance at its worksite where Alaina

12

and Samantha Steele flagged, according to an employee of Wright Brothers and/or Defendant W.D. Wright. Although OSHA issued violations only to Wright Brothers, Alaina Steele's employer, the Amended Complaint plausibly asserts that New River was actually responsible for the conduct forming the basis of the violation.[5]

An OSHA violation does not constitute negligence per se. *Hernandez v. Martin Chevrolet, Inc.*, 72 Ohio St. 3d 302, 304, 649 N.E.2d 1215 (1995). But an OSHA violation *does* present evidence of negligence. *See Estate of Merrell v. M. Weingold & Co.*, 8th Dist. Cuyahoga No. 88508, 2007 Ohio 3070, ¶ 60 (citing *Cross v. Hydracrete Pumping Co., Inc.*, 133 Ohio App.3d 501, n.1, 728 N.E.2d 1104 (1999); *Aldridge v. Reckart Equip. Co.*, 4th Dist. Gallia No. 04CA17, 2006 Ohio 4964, ¶ 83 (citing *Mark v. Mellott Mfg. Co., Inc.*, 106 Ohio App.3d 571, 587-588, 666 N.E.2d 63 (1995)); *Neil v. Shook*, 2d Dist. Montgomery No. 16422, 1998 Ohio App. LEXIS 106 (Jan. 16, 1998); *Harlan v. Universal Forest Prod., Inc.*, 12th Dist. Butler No. CA2003-11-293, 2004 Ohio 3915, ¶ 48; *Klein v. Brothers Masonry, Inc.*, 6th Dist. Lucas No. L-02-1080, 2003 Ohio 3098.

And, at the motion to dismiss stage, Plaintiff need not present *evidence* of negligence, only allegations upon which the Court may draw a reasonable inference of New River's negligence—specifically, in responding to Defendant's Motion, that New River had a duty to Alain Steele. The findings set forth in OSHA's Letter, along with specific allegations of New River's active participation, is more than sufficient to plead a negligence claim against New River. Adequate means of protection from traffic was required at New River's worksite, including the use of a

---

[5] According to OSHA, the violation was based upon a breach of the standards set forth in (1) the Ohio Manual of Uniform Traffic Control Devices, (2) the Federal Highway Administration Manual on Uniform Traffic Control Devices, (3) the American Safety Services Association Field Guide on Installation and Removal of Temporary Traffic Control for Safe Maintenance and Work Zone Operations, and (4) the standards set forth in ANSI/ASSE A10.47 – 2015 Work Zone Safety for Highway Construction.

13

shadow vehicle or police assistance, and New River itself decided that that means of protection would not be present at its worksite. In so doing, New River assumed control over the conditions OSHA found were required to protect Alaina Steele from the type of harm she incurred—being struck by a vehicle driving through the worksite.[6] When a general contractor refuses to eliminate a hazard that causes an injury to an employee of an independent contractor, it meets the active participation standard, and is liable for the employee's injuries. *See Bond,* 72 Ohio St. 3d at 337.

### 2. New River Actively Participated in the Events Leading to Alaina Steele's Death by Directing Alaina and Samantha Steele's Flagging Activities.

The Amended Complaint alleges that New River actively participated in the events that caused Alaina Steele's death by directing Alaina and Samantha Steele where to conduct their flagging activities. Mr. Phillips, an employee of New River, was in charge and controlled the worksite where Alaina Steele was killed. Mr. Phillips "told Alaina and Samantha Steele when to begin work, when to take a lunch, when it was time to stop working, and when and where to move the flagging signs and when and where to flag." (ECF No. 8 at ¶ 72.) And Alaina and Samantha Steele were required to follow all of Mr. Phillips's instructions. (*Id*.) Each day, Mr. Phillips decided on the exact section of roadway his crew would be working, which determined where Alaina and Samantha Steele would have to set up the road signs and flag vehicles, despite the difference in topography. (*Id*. at ¶ 73.) On the day Alaina Steele died, New River's chosen worksite required Alaina and Samantha Steele to place their road signs on the side of a hill. (*Id*. at ¶ 86.) The hillside worksite required a different flagging location and practice to account for

---

[6] Whether OSHA investigated New River for its *own* violations is irrelevant for purposes of *pleading* negligence against New River: the Amended Complaint alleges that New River, too, breached the standards set forth in OSHA's Letter. And OSHA's finding that Wright Brother's violated its regulations does not preclude New River's negligence. *See e.g., Volter v. C. Schmidt Co., Inc.* (1991), 74 Ohio App.3d 36, 41, 598 N.E.2d 35 (stating that "we are aware of no Ohio precedent establishing, as a rule of law, that an employer's OSHA violation for failure to equip a machine with safety devices relieves a manufacturer of strict liability").

visibility concerns due to the downhill site and motorists' minimal site lines of Alaina and Samantha Steele—again, at least not without acceptable means of protection.

>3. **New River Actively Participated in the Events Leading to Alaina Steele's Death by Making Other Decisions Affecting the Safety of Alaina and Samantha Steele at Its Worksite.**

Other allegations in the Amended Complaint provide additional factual support that New River had sole discretion over at least some safety conditions at its worksite. For example, on the Wright's "proposal" or "quote," an exhibit of New River's Motion, New River had the choice to request additional flaggers to meet its safety needs, including to operate a shadow vehicle, and to choose other safety equipment, such as "Arrow Boards." This document does not state that Wright had any knowledge about the specific worksite where its traffic flaggers would be working, or that it made a tailored proposal based upon New River's needs. And according to the written policy of Wright Brothers and/or Defendant W.D. Wright, "the requirements for all field operations are dictated by the site owner." The Amended Complaint also alleges that, Wright employee "Ms. Wickham told Mr. Steele that another flagger was almost struck at the same New River job site and, for this reason, Ms. Poloschan terminated the contract with New River." From these allegations, the Court may plausibly infer that (1) New River maintained control over at least some safety aspect at its worksite and made safety decisions, (2) Wright Brothers and/or Defendant W.D. Wright disagreed with New River's safety decisions to such an extent that they chose to terminate its contract with New River, and (3) New River and W.D. Wright were on notice of the dangerous condition.

>4. **New River Actively Participated in the Events Leading to Alaina Steele's Death by Failing to Ensure a Temporary Traffic Control Plan Was in Place.**

New River also knew that Alaina and Samantha Steele were required, through those who

15

controlled their movement, to follow a traffic control plan for worker safety tailored to its worksite, under the MUTCD Section 6D.03(E) and Ohio's MUTCD Section 6C.01, attached to New River's Motion, but that New River did not conduct one, nor did anyone from Wright Brothers and/or Defendant W.D. Wright.  Under Ohio's MUTCD, "traffic control planning should be completed for all highway construction, utility work, maintenance operations, and incident management including minor maintenance and utility projects prior to occupying the [temporary traffic control] zone." (ECF No. 14, Ex. 2 at 37.)  The plan should be based upon "engineering judgment." (*Id*.)  Ohio's MUTCD also provides that "[p]rovisions may be incorporated into the project bid documents that enable contractors to develop an alternate [temporary traffic control] plan." (*Id*.)  Here, no such plan existed.  Instead, Mr. Phillips directed Alaina and Samantha Steele where the worksite would be located, which dictated where the road signs would be placed and flagger would stand, based upon his own unqualified judgment and the supposed needs of his electrical crew, but without considering the safety of the flaggers. *See W.G. Fairfield Co. v. OSHRC*, 285 F.3d 499, 506 (6th Cir. 2002) (finding that private companies must comply with the MUTCD and the state-adopted versions).

    **C.**    **The Authorities Cited by New River in Its Motion Indicate the Issue of "Active Participation" Should Be Resolved on Summary Judgment or at Trial.**

Despite New River's insistence that the Court dismiss this case at the Fed. R. Civ. P. 12(b)(6) stage, no cases it cites disposed a negligence claim based on an active participation theory on a motion to dismiss.  The reason is that whether a defendant actively participated in events resulting in another's injuries is a fact-intensive question.  New River cites:

- *Abbott v. Jarret Reclamation Srvc., Inc.*, 132 Ohio App. 3d 729, 726 N.E. 2d 511 (7th Dist. 1999)  (granting a directed verdict to defendant-general contractor on the element of duty, *after* denying defendant-general contractor's motion for summary judgment and after full presentation of plaintiff's case to the jury) .

16

- *McKee v. Crum*, 9th Dist. Wayne No. 1801, 1982 WL 5062 (affirming trial court's grant of summary judgment of defendant-general contractor on negligence).

- *Taylor Bros. v. Garcia*, 49 S.W. 3d 430, 434 (Tex. App. 2001) (overturning jury verdict against defendant-general contractor, finding no duty to plaintiff).

- *Kartzer v. GeneralMotors Corp.*, 2nd Dist. Montgomery Nos. 16590, 16593, 16594, 1998 WL 184640 (affirming defendant-general contractor's motion for summary judgment).

- *Foraker v. Cyclops Corp.*, 605 F. Supp. 641, 650 (N.D. Ohio 1985) (*denying* general contractor's motion for summary judgment because a question of fact was raised as to whether "the request by the independent contractor and denial of permission to alter or remedy the situation" constituted negligence.)

- *Cafferkey v. Turner Const. Co.*, 21 Ohio St. 3d 110, 488 N.E. 2d 189 (1986) (affirming grant of summary judgment to defendant general contractor).

These cases stand for the proposition that general contractors, by maintaining supervisory authority over independent contractors or retaining safety procedures for the worksite, *without more*, does not give rise to general contractor's liability under an active participation theory. For example, in *Cafferkey*, the general contractor retained the safety procedures over the worksite, but "neither gave nor denied permission for the critical acts that led to decedent's injuries"—sending men into a hole in the ground after equipment malfunctioned. 605 F. Supp. at 650. In *Kartzer*, although the general contractor conducted safety orientation and daily inspections of the site, it did not (1) direct the activities of the independent contractor, (2) give or deny permission to the independent contractor to conduct the specific activity that gave rise to the injury—guide a wagon through a facility while walking backwards—or (3) give or deny permission to anyone not to cover the hole in which the independent contractor fell. 1998 WL 184640 at *4.

New River relies upon *McKee v. Crum*, the only case it cites involving road flaggers, for the proposition that a "general contractor has no 'duty' to subcontractors' flagger who was struck by oncoming vehicle." Although New River correctly states *Crum's* holding, that case was

17

decided before *Hirschbach v. Cincinnati Gas & Elec. Co.*, the case that created an exception to *Wellman*—the active participation theory. In fact, *Crum* did not discuss or consider the active participation, elements that apply in this case, and thus has no application here.

The cases New River cites that *do* dispose of a negligence claim on a motion to dismiss are qualitatively different: the claims dismissed involve clear legal relationships and could not succeed under *any* set of facts. For example, in *Homan v. George*, 127 Ohio App. 3d 472, 477, 713 N.E.2d 432 (10th Dist. 1998), the trial court's grant of motion to dismiss was affirmed on the basis that a social host owes no duty to an alcoholic guest to discontinue serving alcohol. In *D'Amico v. Delliquadri*, 114 Ohio App. 3d 579, 582, 683 N.E. 2d 814, 815 (11th Dist. 1996), the trial court's grant of motion to dismiss was affirmed on the basis that physicians owe no duty to third parties based upon the information they give their own patients, in part because of physician/patient privilege codified by the Ohio legislature. And in *Jewell v. City of Columbus*, 20 Ohio App. 3d 168, 170, 485 N.E. 2d 266, 268 (1984), the trial court's grant of motion to dismiss was affirmed on the basis that the duty of a police officer to take information at the scene of an accident under the Ohio Revised Code was for the benefit of the department of highway safety, not the parties in the accident. In contrast to these cases, Plaintiff here has alleged facts that plausibly show that New river is liable under an active participation theory—a theory New River concedes *could* give rise to a duty to a general contractor like itself to an employee of a subcontractor like Plaintiff.

### III.   CONCLUSION

This Court should find that Plaintiff has sufficiently plead a negligence/wrongful death claim against New River, and deny New River's motion to dismiss. New River actively participated in events that caused Alaina Steele's injuries and death by (1) deciding against using a police or escort vehicle at its worksite, (2) directing Alaina and Samantha Steele's flagging

18

activities, including the location of the dangerous site, (3) making other safety decisions about procedures and equipment at the site, including the number of flaggers, and (4) failing to ensure a traffic control plan was in place.  Caselaw is clear that the issue of negligence by active participation of a general contractor should be decided after the motion to dismiss stage.

Respectfully submitted,


/s/ Scott E. Smith
Scott E. Smith (#0003749)
Brian R. Noethlich (#0086933)
**Scott Elliot Smith, L.P.A.**
5003 Horizons Drive, Suite 101
Columbus, OH 43220
Telephone: (614) 846-1700
Facsimile: (614) 486-4987
Email: ses@sestriallaw.com
brn@sestriallaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

On November 5, 2019, I electronically filed the foregoing on behalf of Plaintiff, Thomas J. Bonasera, as Administrator of the Estate of Alaina Nicole Steele. Notice of this filing will be sent to counsel through the Court's ECF filing system.  Parties may access this filing through the Court's system.

/s/ Scott E. Smith
Scott E. Smith