UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THOMAS J. BONASERA,

        Plaintiff,

    v.

NEW RIVER ELECTRICAL
CORPORATION, *et. al.*,

        Defendants.

Case No. 2:19-cv-3817
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

The matter before the Court is Defendant New River Electrical Corporation's ("Defendant New River") Motion to Dismiss. (ECF No. 14.) Plaintiff Thomas J. Bonasera ("Plaintiff") has responded and Defendant New River has replied. (ECF Nos. 16, 17.) Additionally, Defendant New River has filed a Notice of Supplemental Authority in Support of its Motion to Dismiss and Plaintiff has filed an Opposition to the Notice. (ECF Nos. 43, 47.) For the reasons stated herein, Defendant New River's Motion to Dismiss (ECF No. 14) is **DENIED**.

**I.**

Plaintiff filed this action on August 6, 2019, in the Franklin County Court of Common Pleas. (Notice Removal, ECF No. 1.) On September 4, 2019, Defendant New River removed the case to this Court. (*Id.*) As this matter is before the Court on Defendant New River's Motion to Dismiss, the allegations in the Complaint are taken as true and are as follows:

On June 14, 2017, Alaina Steele and her niece Samantha Steele applied for a road flagger positions with Wright Brothers in Columbus, Ohio. (Second Am. Compl. ¶ 24, ECF No. 37.) Defendant W.D. Wright ("Defendant W.D.") is affiliated with Wright Brothers and the two

companies operate out of the same office in Columbus Ohio.  (*Id.* ¶¶ 11–13.)  Tiffany Poloschan, a business development specialist for Wright Brothers, informed Alaina and Samantha that Wright Brothers was giving them road flagger positions.  (*Id.* ¶ 27.)

On June 22, 2017, Alaina and Samantha returned to Defendant W.D. and Wright Brother's office to take a road flagger certification class.  (*Id.* ¶ 28.)  During this class Alaina and Samantha received documents titled the Wright Policy Manual (the "Policy Manual"), Wright Safety and Health Manual (the "Safety Manual"), American Traffic Safety Services Association ("ATSSA") Flagger Handbook, and ATSSA Workbook.  (*Id.*)  The Safety Manual stated:

> All field operations conducted by Wright Brothers or subcontractors fall under the requirements of the site owner unless otherwise specified.  In these situations, the procedures are communicated to all affected employees prior to the commencement of work at the pre-job planning meeting, [Job Safety analysis ("JSA"),] or site safety orientation meeting.

(*Id.* ¶ 57.)  Prior to the beginning of each job, Wright Brothers and/or Defendant W.D. was required to formulate a JSA "to ensure that hazards in the workplace [were] accounted for in each and every step of the process."  (*Id.* ¶ 59.)  The Safety Manual also stated: "Wright Brothers employees always must make the final decision on safety."  (*Id.* ¶ 58.)

Victor Martinez, an employee of Defendant W.D. and Wright Brothers, taught the certification class.  (*Id.* ¶ 30.)  Mr. Martinez showed an instructional video on flagger safety and paused to explain some of the topics.  (*Id.* ¶ 31.)  The class lasted three hours.  (*Id.*)  The instruction included how to stand in the road, hold signs, and how and where to place signs.  (*Id.* ¶ 32.)  The instruction did not include the order in which to place or retrieve signs.  (*Id.* ¶ 33.)

After the class Alaina and Samantha took a flagger certification test, which consisted of approximately 20 to 30 multiple choice and true-false questions.  (*Id.* ¶ 36.)  The test took Alaina and Samantha under 20 minutes to complete.  (*Id.*)  Both Alaina and Samantha passed the test and

Mr. Martinez gave them ATSSA flagger certification cards good for four years. (*Id.* ¶¶ 37–38.)

On July 5, 2017, Alaina and Samantha began their first flagging assignment for Wright Brothers. (*Id.* ¶ 40.) This first assignment consisted of on-site training where Defendant W.D. and/or Wright Brothers employees showed Alaina and Samantha how to set up road signs. (*Id.* ¶ 44.) After giving Alaina and Samantha instructions, the employees sat in a truck and watched Alaina and Samantha practice flagging. (*Id.* ¶ 48.) The employees did not monitor, instruct, or critique them. (*Id.* ¶ 49.) This training lasted about four hours. (*Id.* ¶ 50.) From July 6, 2017, to August 3, 2017, Wright Brothers sent Alaina and Samantha to several different job sites for several different companies. (*Id.* ¶ 62.) Other than the July 5, 2017 training instructions, no further instructions or JSAs were provided specific to each job site. (*Id.*)

On August 3, 2017, Ms. Poloschan assigned Alaina and Samantha to a new job for Defendant New River. (*Id.* ¶ 64.) Defendant New River engaged Defendant W.D. and/or Wright Brothers for "traffic control technicians," pursuant to a "proposal" from Defendant W.D Wright and/or Wright Brothers. (*Id.* ¶ 65.) Defendant "W.D. [] and/or Wright Brothers told [Defendant] New River that all field operations conducted by its traffic control technicians—Alaina and Samantha Steele—would fall under the requirements of the site owner, i.e. New River." (*Id.* ¶ 66.) Defendant W.D. and/or Wright Brothers provided Defendant New River with the option of using an "arrow board" at the work site to enhance the site's safety. (*Id.* ¶ 67.) Defendant New River chose not to use an arrow board. (*Id.*)

Defendant New River's foreman Robert Phillips led its worksite and thus:

[Mr. Phillips] had control over Alaina and Samantha Steele's flagging work. He told Alaina and Samantha Steele when to begin work, when to take a lunch, when it was time to stop working, and when and where to move the flagging signs and when and where to flag. Alaina and Samantha Steele understood that they were required to follow all of Mr. Phillips's instructions.

(*Id.* ¶ 72.) Accordingly:

> On a typical day doing work for [Defendant] New River, Mr. Phillips, would inform Alaina and Samantha Steele what poles [Defendant] New River would be working on the following day, indicating to them where to set up the flagging signs. The next morning, as instructed by Mr. Phillips, Alaina and Samantha Steele would arrive at the worksite before [Defendant] New River and place their flagging signs so that [Defendant] New River's worksite was bookended by flagging signs—three signs on one end of the site and three signs on the other end. The signs were placed on the shoulder of the road.
>
> Alaina and Samantha Steele would then drive to the job yard and meet Defendant New River's employees. Mr. Phillips would tell the Defendant New River work crew and Alaina and Samantha Steele that it was time to leave for the work site, and they would all leave together.

(*Id.* ¶¶ 73–74.)

On August 11, 2017, Alaina and Samantha arrived at Defendant New River's jobsite around 7AM. (*Id.* ¶ 87.) They were using a vehicle which contained an identification card listing the insurer as "Penn National insurance." (*Id.* ¶ 83.) The location of this site was at the top of a hill and continued down the side of the hill. (*Id.* ¶ 86.) On this day Alaina and Samantha were the only flaggers on site and there was no police escort to assist them. (*Id.* ¶ 89.) At approximately 11:30AM Mr. Martinez stopped by to the New River worksite. (*Id.* ¶ 90.) Mr. Martinez stated that "the work site location and flags, as chosen by Defendant New River, were not properly placed or that they were dangerously placed on a hill in violation of flagging standards." (*Id.* ¶ 91.) Mr. Martinez left around 12:30PM. (*Id.* ¶ 92.)

Around 1PM Alaina and Samantha began retrieving the signs. (*Id.* ¶ 93.) Defendant W.D. and Defendant New River employees had already left the job site. (*Id.* ¶ 94.) Alaina and Samantha were retrieving the fifth sign when a jeep came into view over the hill traveling at a rate of speed in excess of the speed limit. (*Id.* ¶ 98.) After seeing the jeep, Alaina ran around the passenger side of the pickup truck, which was partially in the grass, and Samantha ran around the driver's side,

which was towards the middle of the road.  (*Id.* ¶ 99.)  The driver of the jeep, Rebecca Cook, braked hard and lost control of the jeep.  (*Id.* ¶ 100.)  The front end of the jeep went off the right side of the road into a ditch, flipped, and landed on Alaina.  (*Id.*)  Samantha heard Alaina making noises when she approached her and saw her leg was trapped under the jeep.  (*Id.* ¶ 102.)

By the time the EMS arrived, Alaina did not have a pulse and was proclaimed dead.  (*Id.* ¶¶ 104–05.)  The Probate Court of Perry County, Ohio appointed Plaintiff as the Administrator of the Estate of Alaina Nicole Steele.  (*Id.* ¶ 8.)  Ms. Cook was convicted of Vehicular Manslaughter under Ohio Revised Code § 2903.06(A)(4) in Licking County Municipal Court.  (*Id.* ¶ 107.)

The Occupational Safety and Health Administration ("OSHA") conducted an investigation into Alaina's death and its causes.  (*Id.* ¶ 111.)  On November 30, 2017, OSHA issued a Citation and Notification of Penalty letter (the "OSHA letter") to Wright Brothers.  (*Id.* ¶ 112.)  The OSHA letter issued one citation based on "two items."  (*Id.* ¶ 113.)  The first item was based on a violation of the OSHA Act of 1970, §5(a)(1) and stated that:

> The employer did not furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees in that employees removing traffic control devices, when there was a danger of traffic flow, were exposed to struck-by hazards.

(*Id.* ¶ 114.)

> Specifically, OSHA found:

> Employees were exposed to struck-by hazards while removing temporary traffic control devices from a rural hilly two-lane roadway without employing positive protection or other acceptable means of protection.  On or about August 11, 2017, an employee was struck and fatally injured by a southbound vehicle while standing outside the company's work truck after having loaded temporary traffic control devices from the shoulder of the north-bound lane and all upstream south-bound temporary traffic control devices had been removed.

(*Id.* ¶ 115.)

The second item was based on 29 C.F.R. §1296.21(b)(1) providing that: "[t]he employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury." (*Id.* ¶ 117.) Specifically, OSHA found:

> [E]mployees were exposed to struck-by hazards while removing temporary traffic control devices from a rural hilly two-lane roadway without employing positive protection or other acceptable means of protection. The employees had not received training on the procedures for retrieving traffic control signs when dismantling a temporary traffic control zone, had not received training on the hazards limited by the topography of the traffic control zone, and had not received training on the safety measures to be taken to protect themselves such as, but not limited to, the use of a shadow vehicle or police assistance.

(*Id.* ¶ 118.)

In addition, OSHA found a failure to follow the Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"), the American Safety Services Association Field Guide on Installation and Removal of Temporary Traffic Control for Safety and Maintenance and Work Zone Operations (the "Field Guide") and the standards set forth in the 2015 Work Zone Safety for Highway Construction ("WZSHC") "to include, but not limited to: [r]emoving traffic control devices by properly trained employees under the supervision of the traffic control supervisor . . . [and] [r]emoving traffic control devices starting from the downstream end." (*Id.* ¶ 116.)

Plaintiff sued Defendant New River, Defendant W.D. and Pennsylvania National Mutual Casualty Insurance Company, doing business as Penn National Insurance. (*Id.* ¶¶ 20–22.) Specifically, with regards to Defendant New River, Plaintiff brings a claim for wrongful death and a survival action and seeks damages. (*Id.* ¶¶ 176–194.)

## II.

Federal Rule of Civil Procedure 12 authorizes dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To meet this standard, the

complaint must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion to dismiss, the Court construes the complaint in the light most favorable to the non-moving party, accepting as true all of plaintiff's factual allegations. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

Nonetheless, the Court must read Rule 12(b)(6) in conjunction with Federal Rule of Civil Procedure 8(a), requiring a short and plain statement of the claim showing that the plaintiff is entitled to relief. *Ogle v. BAC Home Loans Servicing LP*, 924 F. Supp. 2d 902, 907 (S.D. Ohio 2013). Thus, the pleading's factual allegations, assumed to be true, must do more than create mere speculation or suspicion of a legally cognizable claim; they must show entitlement to relief. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Further, "the tenet that courts must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 662. As such, while a plaintiff is not required to set forth detailed factual allegations at the pleading stage, a complaint must contain a basis upon which relief can be granted; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *See id.* at 679; Fed. R. Civ. P. 8(a).

### III.

Defendant New River argues that it had no cognizable duty to Plaintiff that could support a claim of tortious negligence or wrongful death. (Def.'s Mot. Dismiss at 13, ECF No. 14.) In response, Plaintiff contends Defendant New River owed a duty of care to Alaina Steele because it

actively participated in the events that caused her death. (Pl.'s Opp'n Def. New River Electrical Corp.'s Mot. Dismiss at 10, ECF No. 16, hereinafter "Pl.'s Resp.") The issue is whether the employer, Defendant New River, owed the employee, Alaina Steele, of the independent contractor, Wright Brothers and/or Defendant W.D., a duty of care.

"In order to recover on a negligence claim, a plaintiff must prove [that] (1) [] the defendant owed the plaintiff a duty, (2) [] the defendant breached that duty, and (3) [] the breach of the duty proximately caused the plaintiff's [sic] injury." *Miller v. TST Transforce*, No. 2:15-cv-178, 2017 U.S. Dist. LEXIS 40827, at *23 (S.D. Ohio Mar. 21, 2017) (quoting *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198 (1988)). "A Plaintiff's inability to prove any one of these elements is fatal to his or her claim of negligence." *Oliphant v. AWP, Inc.*, 143 N.E.3d 552, 562 (Ohio Ct. App. 2020).

"[W]hether a defendant owes a duty to a plaintiff depends upon the relationship between them." *Id.* (quoting *Huston v. Konieczny*, 556 N.E.2d 505, 508 (Ohio 1990)). "The existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand v. David*, 544 N.E.2d 265, 271 (Ohio 1989); *Oliphant*, 143 N.E.3d at 562.

Ohio has codified the duty an employer owes to the employees of an independent contractor it employs. *Frost v. Dayton Power & Light Co.*, 740 N.E.2d 734, 740 (Ohio Ct. App. 2000) (citing Ohio Revised Code §§ 4101.11–12). These duties do not apply, however, when the contractor engages in inherently dangerous work. *Id.; see also Schlueter v. Rohm & Haas Chems., LLC.*, No. 1:12-cv-88, 2013 WL 5566543, at *3 (S.D. Ohio Oct. 9, 2013) (noting that there is an exception to the codified duty of employers to provide a safe workplace which applies when the employee is one "of an independent contractor who performs inherently hazardous work").

"Work is inherently dangerous when it creates a peculiar risk of harm to others unless special precautions are taken." *Oliphant*, 143 N.E.3d at 563 n.4 (quoting *Pusey v. Bator*, 762

N.E.2d 968, 973 (Ohio 2002)). "The [Ohio] Supreme Court has recognized that a construction site is an inherently dangerous working environment." *Id.* (citing *Michaels v. Ford Motor Co.*, 650 N.E.3d 1352, 1355–56 (Ohio 1995)). "Courts have further determined that construction that occurs on a roadway is also inherently dangerous." *Id.* (citing *Cowell v. Ohio Dep't of Trans.*, No. 2003-09343-AD, 2004 WL 67230, at *5 (Ohio Ct. App. Jan. 14, 2004)).

Plaintiff alleges that Alaina Steele was engaged in work on a roadway and near a construction site. (Second Am. Compl. ¶¶ 64, 73, 75, 78.) Plaintiff also alleges Alaina's work was dangerous and hazards were present. (*Id.* ¶¶ 59–60, 85, 89, 114–115, 117.) Plaintiff has sufficiently stated, for purposes of this motion to dismiss, that the deceased was engaged in an inherently dangerous activity. Defendant New River does not disagree. (Def.'s Mot. Dismiss at 18 n.12.) Thus, the codified duty of care is inapplicable.

In a series of cases, the Ohio Supreme Court has discussed a contractor's liability to the employee of an independent contractor performing inherently dangerous work. *Oliphant*, 143 N.E.3d at 562. "It must be kept in mind that the primary responsibility for protecting the employees of an independent contractor lies with the employer; i.e., the independent contractor." *Abbott v. Jarrett Reclamation Servs.*, 726 N.E.2d 511, 518 (Ohio Ct. App. 1999) (citing *Eicher v. United States Steel Corp.*, 512 N.E.2d 1165, 1167 (1987)). Thus, "[t]he rule of general acceptance is that where an independent contractor undertakes to do work for another in the very doing of which there are elements of real or potential danger and one of such contractor's employees is injured as an incident to the performance of the work, no liability for such injury ordinarily attaches to the one who engages the services of the independent contractor." *Wellman v. East Ohio Gas Co.*, 113 N.E.2d 629, 632 (Ohio 1953).

9

There is an exception, however, when the "one who hired [the] independent contractor, *actually participate[d]* in the subcontractor's job and fail[ed] to remove a hazard that could have been removed with ordinary care." *Id.* (citing *Hirschbach v. Cincinnati Gas & Elec. Co.*, 452 N.E.2d 326, 329 (Ohio 1983)) (emphasis added). "The Ohio Supreme Court has defined 'active participation' to mean 'that the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project.'" *Id.* (citing *Bond v. Howard Corp.*, 650 N.E.2d 416, 420–21 (Ohio 1995) (emphasis added)); *see also Cafferkey v. Turner Constr. Co.*, 488 N.E.2d 189, 192 (Ohio 1986) ("A general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work.").

In *Sopkovich v. Ohio Edison Company*, 693 N.E.2d 233, 243 (Ohio 1998), the Ohio Supreme Court further explained active participation by describing two scenarios. First, "a property owner's retention or possession and control over the *work area* of an independent contractor's employees" creates a duty. *Id.* (emphasis added). Second, when "a property owner either directs or exercises control over the *work activities* of the independent contractor's employees, or where the owner retains or exercises control over a critical variable in the workplace" there is a duty. *Id.* (emphasis added).

Plaintiff contends there are four allegations in the Second Amended Complaint which show Defendant New River actively participated in the events that caused Alaina's death. (Pl.'s Resp at 10.) These four allegations are: (1) Defendant New River chose not to have a police or escort vehicle; (2) Defendant New River directed Alaina and Samantha Steele's flagging activities; (3) Defendant New River chose to have a two person crew and not to have a sign board or other

10

safety precautions; and (4) Defendant New River failed to ensure a proper temporary traffic control plan was in place. (*Id.*) The Court begins with Plaintiff's claim that the Second Amended Complaint alleges Defendant New River directed the flagging activities, and thus, actively participated in Alaina Steele's work. Because the Court finds this allegation satisfies the active participation standard it need not address the other three.

Plaintiff contends that the Second Amended Complaint contains allegations that Defendant New River directed Alaina and Samantha's flagging activities. (Pl.'s Resp. at 14–15.) For example, the Second Amended Complaint states that Defendant new river "had control over Alaina and Samantha Steele's flagging work." (Second Am. Compl. ¶ 72.) It also alleges that Mr. Phillips, an employee of Defendant New River, told Alaina and Samantha "when and where to the move the flagging signs and when and where to flag." (*Id.*) Specifically, in regard to the day Alaina was killed, the Second Amended Complaint alleges that:

> On August 10, 2017, while working at the New River Job site, decedent Alaina and Samantha Steele were instructed by Mr. Phillips how to flag the job site, including where to place the flagger-symbol signs for August 11, 2017, the following day. New River knew that the terrain at its worksite was hilly and that there was danger of traffic flow on the road where New River was working.

(*Id.* ¶ 85.) Further, the Second Amended Complaint alleges that:

> Mr. Phillips chose the specific location of New River's job site for August 11, 2017, which was located at the top of a hill and continuing down the side of the hill. Mr. Phillips instructed Alaina and Samantha Steele that the signs would have to be set up in this area for the next day.

(*Id* ¶ 86; *see also id.* ¶ 91 (noting the work site location, "as chosen by New River" was dangerous and "in violation of flagging standards").)

Additionally, the Second Amended Complaint alleges that Alaina and Samantha parked their vehicles "as instructed by Mr. Phillips." (*Id.* ¶ 76; *see also id.* ¶ 78 ("While placing or picking up the signs, Alaina stopped the Wright van halfway in grass and halfway on the road . . . as

11

instructed by Defendants W.D. Wright and New River.").)  Plaintiff contends that all of these allegations show Defendant New River actively participated in the critical events which led to Alaina's death.  (Pl.'s Resp. at 14–15.)  Plaintiff's argument is well-taken.

The critical variables in the workplace that led to Alaina's death, as alleged in the Second Amended in Complaint, were the placement of the signs and flaggers on August 11, 2017 and the retrieving of the signs at the end of the day.  The Second Amended Complaint alleges that the terrain on this particular worksite "was hilly" and thus there "was a danger of traffic flow on the road."  (Second Am. Compl. ¶ 85.)  The allegations are clear that Mr. Phillips "chose the specific location" of the job site on that day.  (*Id.* ¶ 86.)  Additionally, Mr. Phillips directed the set-up of the flagging signs within this workplace, directing Alaina and Samantha to place a sign on the crest of the hill, one on the second downside of the hill, and then one at the bottom of the hill.  (*Id.* ¶ 88.) These allegations, taken as true, show that Mr. Phillips actively participated in at least one of the variables that led to Alaina's death, the location of the signs and flaggers on August 11, 2017.  This active participation creates to a duty of care under Ohio law.

Defendant New River argues that the allegations in the Second Amended Complaint only create a duty for Defendant W.D. not for Defendant New River.  (Def.'s Mot. Dismiss at 14.)  For example, the Second Amended Complaint states that "Wright Brothers employees must always make the final decision on safety."  (Second Am. Compl. ¶ 58.)  Similarly, it alleges Wright Brothers and/or Defendant W.D. were required to formulate JSAs at the beginning of each job to keep employees safe.  (*See id.* ¶ 59.)  Defendant New River argues that this case is like *Abbott v. Jarrett Reclamation Services* in this regard.  (Def.'s Reply at 4–7, ECF No. 17 (citing 726 N.E.2d at 518).)  Defendant New River contends it "never gave nor denied permission for the critical acts that led to [the plaintiff's] death."  (*Id.* (citing 726 N.E.2d at 518).)  Specifically, Defendant New

River never denied permission for Defendant W.D. and Wright Brother's employees to use safety equipment but rather it was up to Wright Brothers and/or Defendant J.D. to provide such safety procedures. (*See id.*)

Defendant's argument is not persuasive because the allegations with regard to Defendant W.D. do not serve to erase the allegations with regard to Defendant New River. It is possible the Second Amended Complaint states a claim of negligence against Defendant W.D and/or the Wright Brothers. That issue, however, is not for the Court to resolve on the instant motion. According to the Second Amended Complaint, which at this time must be assumed as true, Defendant New River actively participated in the events leading to Alaina's death. Further, Defendant New River may be correct that it did not prevent Defendant W.D. or Wright Brothers from taking safety precautions. This does not eliminate, however, the fact that it chose to have the flagger signs in a dangerous area.

This case is distinguishable from *Abbott*. In *Abbott*, the defendant general contractor performed a purely supervisory role in directing the employee of the independent contractor's schedule and site location, holding meetings, and reminding workers of safety precautions. 726 N.E.2d at 519. The defendant general contractor did not direct any of the deceased's trenching or excavating activities, which was the activity the deceased was engaged in when he died. *Id.* at 520. Importantly, the court found the critical acts leading to the employee's death were that he entered a deep trench without means of egress and without safety equipment present. *Id.* The defendant general contractor did not direct him into the trench or even know he was in the trench. *Id.* The independent contractor retained complete control over this aspect of the work. *Id.*

In contrast, Alaina and Defendant W.D. and/or Wright Brothers did not retain complete control over a critical act leading to Alaina's death. That act was choosing the location of the

flagging activities on August 11, 2017.  In contrast to *Abbott* where the defendant did not direct the employee into the area that caused him death, Defendant New River did direct Alaina where the flagging should take place which in part caused her death.  Defendant's argument that this case is like *Abbott* is not persuasive.

Additionally, Defendant New River contends that the allegations only provide that it supervised Alaina and Samantha and not that it partook in the specific events leading up to Alaina's death.  For example, Mr. Phillips told Alaina and Samantha "when to begin work, when to take a lunch, [and] when it was time to stop working."  (Second Am. Compl. ¶ 72; *see also id.* ¶ 74 ("Mr. Phillips would tell the New River work crew and Alaina and Samantha Stele that it was time to leave for the work site.").)  In contrast to these broad supervisory allegations, Defendant contends that no one from Defendant New River ever directed Alaina and Samantha how to pick-up signs at the end of a shift.  (*Id.* ¶94.)

The Court agrees with Defendant New River that some of the allegations lead only to supervisory authority.  For example, the allegations relating to Defendant New River's ability to direct when the flaggers began work, took a lunch, and stopped working, show only that Defendant New River had supervisory authority.  *See Abbott*, 726 N.E.2d at 520 (noting that the defendant, who directed the schedule, held safety meetings, and reminded the workers of safety precautions, had only a supervisory authority). The Second Amended Complaint goes further, however, and states allegations showing Defendant actively participating in the critical variables leading to Alaina's death.  These allegations show Defendant New River owed Alaina a duty of care.  *See Sopkovich*, 693 N.E.2d at 243.

Finally, Defendant New River argues the Court should consider the recent case *Oliphant v. AWP, Inc*.  In *Oliphant* an Ohio court considered the duty independent contractors owe each

other's employees when working in the same place.  *See* 143 N.E.3d at 561–568.  The *Oliphant*
court stated that to actively participate means to "direct[] the activity which resulted in the injury
and/or [give] or den[y] permission for the critical acts that led to the employee's injury."  *Id.* at
564.  Additionally, the court stated there must be "sins of commission rather than omission."  *Id.*
Defendant New River contends it did not give instructions to Alaina about how to retrieve the
signs and thus, did not actively participate in the events leading to her death.  (Def. New River
Electrical Corp.'s Notice Suppl. Authority Supp. Mot. Dismiss at 4, ECF No. 43.)

There are at least two issues with Defendant New River's reliance on *Oliphant*.  First,
*Oliphant* analyzed the relationship between two independent contractors which, as the court
recognized, is different than situations involving a contractor and an independent contractor.  *Id.*
at 563–64 (noting that "[a]pplying the active participation definition stated in *Bond* and *Sopkoviich*
is often unworkable in situations involving multiple subcontractors." (internal citations omitted)).
Second, Defendant considers the variables leading to Alaina's death too narrowly.  It was not
merely that Alaina was picking up signs.  It was that Alaina was picking up signs on a hilly road
where incoming drivers' views of her were obstructed until they came over the top of the hill.
Defendant New River instructed her to place the signs on the hilly road.

Importantly, the case is currently before the Court on a motion to dismiss.  Many of the
cases Defendant New River cites in support of its arguments were before the courts on summary
judgment or directed verdicts after several days of evidence and thus, the courts had the benefit of
the parties' discovery and/or evidence.  *See e.g., Oliphant*, 143 N.E.3d at 568 (affirming the lower
court's grant of summary judgment to a general contractor defendant because the defendant had
no duty to the plaintiff); *Abbott*, 726 N.E.2d at 520 (finding the trial court did not err in granting
the general contractor employer a directed verdict because the plaintiff did not present evidence

that the general contractor had a duty to protect the independent contractor's employer). At this stage of the case, relying on the Second Amended Complaint, its allegations, and inferences which can be drawn therefrom, the Court finds Plaintiff has stated a claim that Defendant New River owed Alaina Steele a duty of care.

IV.

For the reasons stated herein, Defendant's Motion to Dismiss (ECF No. 14) is **DENIED**.

**IT IS SO ORDERED.**


**8/24/2020**                                    **s/Edmund A. Sargus, Jr.**
**DATE**                                          **EDMUND A. SARGUS, JR.**
                                                  **UNITED STATES DISTRICT JUDGE**