# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**THOMAS J. BONASERA,**

      **Plaintiff,**

      **v.**

**NEW RIVER ELECTRICAL**
**CORP.,** *et al.,*

      **Defendants.**

**Case No. 2:19-cv-3817**
**Judge Edmund A. Sargus, Jr.**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

This matter is before the Court on Defendant Pennsylvania National Mutual Casualty Ins. Co.'s ("Penn National") Motion for Judgment on the Pleadings or Alternatively Motion to Bifurcate and Stay (ECF No. 44); Plaintiff Thomas J. Bonasera's ("Bonasera") Motion for Partial Summary Judgment (ECF No. 58); and Penn National's Motion for Additional Time to File a Response to Bonasera's Motion for Partial Summary Judgment (ECF No. 65). For the following reasons, Penn National's Motion for Judgment on the Pleadings is **DENIED**; Penn National's Alternative Motion to Bifurcate and Stay is **GRANTED IN PART** and **DENIED IN PART**; Bonasera's Motion for Partial Summary Judgment is **GRANTED**; and Penn National's Motion for Additional Time to File a Response is **DENIED**.

### I. BACKGROUND

This case arises from the death of Alaina Steele, who was struck and killed by a vehicle while retrieving road signs during her job as a road flagger.

**A. Undisputed Facts Leading Up to Alaina Steele's Death**

In the summer of 2017, Alaina Steele and her niece, Samantha Steele, applied for positions as "road flagger[s]" at Wright Brothers, Inc. ("Wright Brothers"). (Affidavit of Samantha Steele ¶¶ 4–5, hereinafter "Steele Aff.," ECF No. 58-1.) Wright Brothers hired the pair and put them through a "road-flagger certification class." (*Id.* ¶ 7.) The class showed them "how to stand in the road, how to hold the signs, how and where to place the signs, and to always have an escape route." (*Id.* ¶ 10.) The class also taught them to use six different signs, with three for each direction of traffic. (*Id.* ¶ 15.) Alaina and Samantha completed the class and passed a flagger certification test. (*Id.* ¶¶ 17–19.) They were issued an "ATSSA flagger certification card", which certified them to flag anywhere in the United States for four years. (*Id.*)

After becoming certified to work as flaggers, a supervisor at Wright Brothers would send Alaina and Samantha a daily "group text" informing them which job they would work on a given day. (*Id.* ¶ 23.) From July of 2017 until August of 2017, Wright Brothers sent the two together to work as flaggers at job sites for various companies around Ohio. (*Id.* ¶ 40; Deposition of Samantha Steele at 25:2, hereinafter "Steele Dep.," ECF No. 57-1.) At first, Alaina and Samantha were issued a white van to take equipment to and from job sites that had "Wright" in large letters on both sides and an orange strobe light on the hood. (Steele Aff. ¶ 36.) Wright Brothers told the pair that one of them would be the driver for the first six months and the other would drive for the six months after that. (*Id.* ¶ 38.) Alaina and Samantha agreed that Alaina would be the first driver. (*Id.* ¶ 39.)

In early August of 2017, Wright Brothers sent Alaina and Samantha a group text instructing them to go to a new job for New River Electric ("New River") in Granville, Ohio. (*Id.* ¶ 45.) The two worked at the New River job site for a week prior to the accident that killed Alaina. (Steele

Dep. at 24:20–23.) New River was working on electric poles that lined the road. (*Id.* at 25:3–15.) The foreman for New River showed Alaina and Samantha which poles New River would be working on the following day, instructing them where to place the flagger signs. (Steele Aff. ¶ 47.) So, at the beginning of each day, Alaina and Samantha set up road flags at different parts of the road depending on where New River was working. (Steele Dep. at 25:3–15.) When the New River employees were finished with work for the day, Alaina and Samantha retrieved the signs they had placed on the road. (*Id.* ¶ 53.) When retrieving the signs, Alaina would "drive the Wright van in front of the area where the sign was located, stop the vehicle, place it in park, but leave the vehicle running" while she and Samantha loaded signs into the van. (*Id.* ¶ 55.) Alaina pulled the two right-sided tires into the grass on the side of the road while leaving the two left-sided tires in the road, with the white "fog line" running through the middle of the van. (*Id.* ¶ 54.) Alaina turned on the strobe light and hazard lights when pulling over to retrieve signs. (*Id.* ¶ 56.)

While working at the New River site, the tires on Wright Brothers van began to go flat. (*Id.* ¶ 58.) Alaina and Samantha retrieved a replacement vehicle from Wright Brothers on August 9, 2017 during their lunch break. (*Id.* ¶ 58.) The replacement vehicle was a 2017 Chevy Silverado pickup truck that had same large "Wright" letters on each side and an orange strobe light on top, just as the van had. (*Id.* ¶¶ 58–59.)

On the morning of August 11, 2017, Alaina and Samantha arrived at the New River job site using the 2017 Chevy Silverado. (*Id.* ¶¶ 61, 63–65.) They set up signs around 7:00 a.m. (*Id.* ¶¶ 65.) They stopped work for the day at 1:00 p.m. and began to retrieve the six signs they had placed in the morning. (*Id.* ¶¶ 68–69.) When they approached the fifth of six signs, "Alaina stopped the vehicle and put it in park but left the vehicle running to retrieve the fifth sign." (*Id.* ¶ 70.) The truck was partially on the road, with a ditch to the right of the truck. (Steele Dep. at

3

44:13–19.) Alaina and Samantha both stepped out of the vehicle and retrieved the sign and base of the sign, and placed the objects in the bed of the truck. (Steele Dep. at 43:19–22, 47:1–6.)

After Alaina and Samantha placed the sign in the bed of the truck, Samantha heard a "loud vehicle" behind them. (Steele Aff. ¶ 71.) She then turned to witness a Jeep coming toward them from over a hill roughly 150 yards away, travelling "approximately 65 to 75 miles per hour." (*Id.*) At that moment, Alaina was standing by the passenger side taillight and Samantha was standing on the driver's side next to the tailgate. (Steele Dep. at 43:25–45:14.) As the Jeep approached, Samantha saw the driver of the Jeep slam on the brakes, causing the front end of the Jeep to "nose dive[.]" (Steele Dep. at 47:12–22.) Both women took off running; Samantha ran to the driver's side and Alaina "ran on the passenger side" toward the ditch. (*Id.* at 47:12–22, 196:12–14.) Samantha then witnessed the Jeep roll over toward the ditch, hit Alaina in the ditch, roll up on the embankment and then settle down on top of Alaina's leg. (*Id.* at 47:12–22, 49:7–11, 196:1–197:3; Steele Aff. ¶ 73.)

Once the Jeep came to a rest, Samantha ran to assist Alaina. (Steele Aff. ¶ 74.) The EMS arrived, told Samantha that Alaina did not have a pulse, and attempted CPR. (*Id.* ¶¶ 77–78.) After attempting CPR, the EMS informed Samantha that Alaina Steele had passed away. (*Id.* ¶ 79.)

**B. Allegations Against Penn National Insurance**

Following Alaina Steele's death, this action was initiated by Bonasera, the administrator of Alaina's estate. (Second Am. Compl. ¶ 1, ECF No. 37.) Bonasera brings wrongful death and survivorship claims against W.D. Wright Contracting, Inc. ("W.D. Wright") and New River. (*Id.* ¶¶1–5.) Bonasera alleges that W.D. Wright is affiliated with Wright Brothers, Alaina's employer at the time of the accident. (*Id.* ¶ 11.)

4

More pertinent for this Opinion and Order, Bonasera also brings a declaratory judgment action, a breach of contract claim, and a bad faith claim against Penn National. (*Id.* ¶¶ 136–61.) An insurance card was located inside the 2017 Chevy Silverado at the time of the accident listing W.D. Wright as the "insured" and the insurer as "Penn National Insurance[.]" (*Id.* ¶ 128.) The policy number was listed as "AU90682932." (*Id.* ¶ 130.) Bonasera alleges that this policy provides underinsured motorist coverage to Alaina Steele because Alaina Steele qualified as an "insured" at the time of the accident. (*Id.* ¶ 130.)

Bonasera claims that he first sent letters requesting information about insurance coverage pertaining to the accident on August 25, 2017. (*Id.* ¶¶ 119–20.) After sending letters, an attorney from Reminger Co., L.P.A., responded on September 12, 2017 informing Bonasera that the attorney was representing W.D. Wright. (*Id.* ¶ 122.) The attorney "refused" to provide any insurance information. (*Id.*) Bonasera then sent letters on September 27, 2017 and November 1, 2017, to a litigation specialist at Penn National and an attorney for Wright Brothers requesting consent to settle with the driver of the Jeep, Rebecca Cook. (*Id.* ¶ 123.) Cook carried an insurance policy for $25,000 from Safe Auto Insurance Company. (*Id.*) The "recipients [at Penn national and Wright Brothers] refused to provide the information" his letter sought. (*Id.*) He again sent a letter to all defendants on January 18, 2018 requesting consent to settle with Cook and Safe Auto and requesting any insurance information relating to the accident. (*Id.* ¶ 124.) And he claims that the defendants again "refused to provide responsive information to" the request. (*Id.* ¶ 125.)

Following unsuccessful attempts to obtain insurance information, Bonasera received a letter on January 24, 2018 from an attorney representing Wright Brothers and Penn National. (*Id.* ¶ 126.) The letter stated: "we are still in the process of reviewing the relevant insurance policies and investigative materials surrounding the collision that occurred on August 11, 2017.  As such

we will need more time to determine our position on your request for the potential [underinsured motorist] carrier to consent to settle the offer from the tortfeasor's insurance carrier." (*Id.*) Bonasera claims that, after this letter, he did not hear back from the defendants on his request for information and consent to settle. (*Id.* ¶ 127.)

Penn National did not provide Bonasera "with a copy of the insurance policy or declarations pages relating to policy AU90682932 until after this action was filed and did so only in response to Plaintiff's discovery requests" in March of 2020. (*Id.* ¶ 130–33.) According to Bonasera, Penn National had been "reviewing" the relevant insurance policy "since at least January 2018 and, upon information and belief, since at least November 2017" but "refused to produce the applicable insurance policy" until discovery in this case. (*Id.*) Penn National's answer to one of Bonasera's interrogatories indicates that it denied coverage to Alaina Steele because she "is not an 'Insured' under the policy because she was not 'occupying' the vehicle in question even though, under the facts of this case and Ohio law, such a position is not reasonably justifiable." (*Id.* ¶ 133.)

Bonasera's first cause of action against Penn National is for a declaratory judgment. (*Id.* ¶ 136.) He seeks "a declaration of rights, duties, and liabilities of the parties under the insurance policy or policies with respect to which policy or policies of insurance issued by" Penn National. (*Id.* ¶ 143.) Bonasera next brings a breach of contract claim against Penn National, seeking to "recover applicable UIM policy limits[.]" (*Id.* ¶¶ 145–51.) Last, Bonasera brings a claim for bad faith against Penn National for allegedly "failing to properly investigate Plaintiff's claims for over two years"; "never prepar[ing] an evaluation of Plaintiff's damages"; and for refusing to provide the applicable insurance policy until discovery in this case. (*Id.* ¶¶152–58.) Bonasera alleges that Penn National's conduct "constitutes malice and a conscious disregard for the rights of its

insureds." (*Id.* ¶ 159.)  Bonasera claims that, as a result of Penn National's bad faith, he has "suffered compensatory damages as set forth in this amended complaint" and is also entitled to punitive damages and attorneys' fees. (*Id.* ¶ 160–61.)

## II. DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Penn National moves for judgment on the pleadings on Bonasera's bad-faith claim, arguing that Bonasera has not sufficiently pleaded compensatory damages.  (*See* Def.'s Mot. J. on Pleadings, ECF No. 44.)

### A. Standard

The Federal Rules of Civil Procedure provide that, "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard of review for a Rule 12(c) motion for judgment on the pleadings is identical to the standard for a motion to dismiss under Rule 12(b)(6).  *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008).  To state a claim upon which relief may be granted, Plaintiffs must satisfy the pleading requirements set forth in Rule 8(a).  While Rule 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief," in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (clarifying the plausibility standard articulated in *Twombly*).  Furthermore, "[a]lthough for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, [it][is] not

bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 677–79 (quoting *Twombly*, 550 U.S. at 55) (internal quotations omitted).

In *Twombly*, the Supreme Court concluded that, to meet the Rule 8 standard, a complaint must "nudge [] [a plaintiff's] claims across the line from conceivable to plausible." 550 U.S. at 570. The Court held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [entitlement] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal citations and quotations omitted). "Naked assertion[s] . . . without some further factual enhancement" stop short of the line between "possibility and plausibility of entitle[ment] to relief." *Id.* at 557 (internal quotations omitted).

In *Iqbal*, the Court explained that one of the "principles" underlying *Twombly* is that the ordinary rule that courts must accept as true allegations made in pleadings for purposes of deciding a Rule 12(b)(6) motion does not apply to legal conclusions. *Id.* at 678. In other words, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

A motion for judgment on the pleadings may be granted only if the moving party is clearly entitled to judgment. *Source Assocs. v. Valero Energy Corp.*, 273 F. App'x. 425, 427 (6th Cir. 2008).

### B. Analysis

In Ohio, insureds may bring a tort claim for bad faith against insurers who fail to act in good faith in the procession of a claim. *See Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994). An insurer "fails to exercise good faith in the processing of a claim of its insured

where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Id.* (citation omitted).  Whether an insurer is liable for bad faith is not dependent on whether the insurer breached the insurance contract. *Valley Force Ins. Co. v. Fisher Klosterman, Inc.*, No. 1:14-CV-792, 2016 WL 1642961, at *3 (S.D. Ohio Apr. 26, 2016) (citing *Gerken v. State Auto Ins. Co.*, No. 13CA14, 2014–Ohio–4428, ¶ 46 (4th Dist. Sept. 8, 2014)). "Rather, the liability arises from the breach of a positive legal duty imposed by law due to the relationship of the parties." *Id.* (citing *Gerken*, 2014–Ohio–4428, ¶ 46) (internal quotations omitted).

An insurer "who acts in bad faith is liable for those compensatory damages flowing from the bad faith conduct of the insurer[.]" *Zoppo*, 644 N.E.2d at 402.  These "extra-contractual damages" are "actual damages over and above those covered by the insurance contract sustained by the insured as a consequence of the insurer's bad faith[.]" *Asmaro v. Jefferson Ins. Co. of New York*, 574 N.E.2d 1118, 1123 (Ohio Ct. App. Mar. 31, 1989).  If a plaintiff succeeds on a bad-faith claim, "punitive damages are available upon a showing of actual malice." *Id.*  Attorneys' fees "may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted." *Zoppo*, 644 N.E.2d at 402.

Penn National argues that Bonasera's bad-faith claim is futile because he has failed to sufficiently plead compensatory damages.  The crux of this argument is that Bonasera "fails to allege any damages sustained by the decedent *as a result of the insurer's alleged bad faith*." (Def.'s Mot. J. on Pleadings at 5 (emphasis added).)  Penn National's causation argument focuses on paragraph 160 of the Complaint, which states: "As a direct and proximate result of Defendant's acts, omissions, and conduct, Plaintiff has suffered compensatory damages as set forth in this amended complaint." (Second Am. Compl. ¶ 160.)  Penn National claims that, because Bonasera's

bad-faith claim only alleges that he suffered damages *as set forth* in the amended complaint, Bonasera has not actually alleged any damages caused by Penn National's bad faith. According to Penn National, the compensatory damages "set forth" in the amended complaint only flow from damages suffered by the decedent as a result of other causes of action in the complaint—wrongful death, survivorship, and breach of contract. (Def.'s Mot. J. on Pleadings at 5 (emphasis added).) Thus, according to Penn National, Bonasera fails to state a claim for bad faith under Ohio law because he does not allege he suffered any damages. Penn National further argues that, because Bonasera fails to allege compensatory damages on his bad-faith claim, he cannot recover punitive damages or attorneys' fees either. (*Id.* at 6.)

Bonasera responds that his bad-faith claim sufficiently alleges compensatory damages. (Pl.'s Response at 2.) He argues that the complaint provides "a litany of facts, bad faith allegations and allegations of damages that when assumed are true are sufficient to have pleaded compensatory damages." (*Id.* at 10.)

Bonasera relies on *Valley Force Ins. Co. v. Fisher Klosterman, Inc.* to defend the sufficiency of his pleading. No. 1:14-CV-792, 2016 WL 1642961 (S.D. Ohio Apr. 26, 2016). In *Valley Force Ins. Co.*, the insurer mounted several challenges to the insured's counterclaim for bad faith, including the argument that the insured failed to allege any compensatory damages as part of its claim. *Id.* at *12. The paragraph containing the insured's damages allegation stated: "By reason of the foregoing, FKI is entitled to compensatory and punitive damages, in an amount to be determined at trial[.]" *Id.* at *2. In analyzing the sufficiency of this allegation under Rule 8, the Court rejected the insurer's argument that the allegation was insufficient. *Id.* at *12. The allegation for "compensatory damages" sufficiently placed the insurer on notice that the insured was requesting compensatory damages as part of its recovery. *Id.* The facts pleaded in the

paragraphs prior to the compensatory-damages paragraph sufficiently supported "a cause of action for bad faith from which compensatory damages would naturally flow." *Id.* The fact that the insured did not "specify each and every form of compensatory damages it [was] seeking" did not preclude the insured from recovering compensatory damages. *Id.*

*Valley Force Ins. Co.* is on point. Just like the insured in *Valley Force Ins. Co.*, Bonasera's well-pleaded factual allegations support a cause of action for bad faith "from which compensatory damages would naturally flow." *Id.* Bonasera pleads several factual allegations that, taken as true, plausibly allege that Penn National failed to act in good faith in the processing of a claim of its insured without reasonable justification. (*See* Second Am. Compl. ¶¶ 119–58.) And Bonasera's allegation that he "has suffered compensatory damages as set forth in this amended complaint" sufficiently places Penn National on notice that Bonasera is seeking compensatory damages for the alleged bad faith. (*Id.* ¶ 160.)

Penn National does not contest the sufficiency of these factual allegations. Its argument focuses only on the compensatory-damages paragraph. Penn National interprets the phrase "compensatory damages as set forth in the amended complaint" as referring only to the compensatory damages alleged for Bonasera's other claims because those damages are "set forth" elsewhere in the complaint. (*Id.*) But this phrase can just as plausibly be interpreted as referring to the damages as set forth *from the factual allegations regarding Penn National's bad faith* in the complaint. Rule 8 does not dictate such a narrow framing of Bonasera's compensatory damages allegation; it does not require Bonasera to "specify each and every form of compensatory damages" he is seeking. *Valley Force Ins. Co.*, 2016 WL 1642961, at *12. Thus, Penn National's argument fails. Bonasera has sufficiently alleged compensatory damages. Penn National's argument that "because Plaintiff has not alleged compensatory damages on the bad faith claim, punitive damages

[and attorneys' fees] cannot be awarded" also necessarily fails because Bonasera has alleged compensatory damages. (Def.'s Mot. J. on Pleadings at 6.)

Accordingly, Penn National is not entitled to judgement on the pleadings.

## III. DEFENDANT'S ALTERNATIVE MOTION TO BIFURCATE AND STAY

Penn National moved in the alternative to: (1) stay discovery and bifurcate the proceedings on Bonasera's bad-faith claim "until the resolution of all coverage issues"; and (2) bifurcate the punitive damages phase of the trial. (Def.'s Mot. J. on Pleadings at 7.)

### A. Bifurcation of the Bad-Faith Claim

Penn National asks the Court to bifurcate the bad-faith claim and stay of discovery on the bad-faith claim pending resolution of the underlying coverage claims. (Def.'s Mot. J. on Pleadings at 7.) It argues that bifurcation and stay are necessary to prevent "unfair prejudice" to Penn National and that bifurcation and stay would "promote judicial economy." (*Id.* at 8, 15.)

Federal Rule of Civil Procedure 42(b) governs the analysis of Penn National's bifurcation motion. The Court has discretion to bifurcate the bad faith or punitive damages claims "for convenience, to avoid prejudice, or to expedite and economize[.]" Fed. R. Civ. P. 42(b). "Federal courts in Ohio have at times also bifurcated bad-faith claims and stayed discovery pending resolution of other case-dispositive claims." *Woods v. State Farm Fire & Casu. Co.*, No. 2:09-CV-482, 2010 WL 1032018, at *2 (S.D. Ohio Mar. 16, 2010). Because bad-faith claims permit an insured to discover "materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage[,]" the Court may also stay discovery on the bad-faith claim if "it finds that the release of this information will inhibit the insurer's ability to defend on the underlying claim[.]" *Boone v. Vanliner Ins. Co.*, 744 N.E.2d 154, 158 (Ohio 2001).

Whether claims should be bifurcated depends "on the facts and circumstances of each case." *Saxion*, 86 F.3d at 556. Defendants in bad-faith cases faced with disclosure of privileged documents are not automatically entitled to bifurcation of claims and a stay of discovery. *Woods*, 2010 WL 1032018, at *3. Instead, the defendant must make a "specific showing" of how the bad-faith claim will prejudice its defense of the underlying coverage claim. *Id.* (citing *Gaffney v. Federal Ins. Co.*, No. 5:08-CV-76, 2008 WL 3980069, at *3 (N.D. Ohio Aug. 21, 2008)); *Penn-Starr Ins. Co. v. Barr Bros. Plastering Co.*, No. 2:10-CV-00587, 2011 WL 1256623, at *3 (S.D. Ohio Mar. 31, 2011). "Similarly, a defendant may not rely on the mere possibility that resolution of the coverage issue may preclude plaintiff's bad-faith claim." *Woods*, 2010 WL 1032018, at *3 (citing *General Electric Credit Union v. National Fire Ins.*, No. 1:09-CV-143, 2009 U.S. Dist. LEXIS 96085, at *15 (S.D. Ohio Sep. 30, 2009)). The "party seeking bifurcation has the burden of showing that concerns such as judicial economy and prejudice weigh in favor of granting the motion." *Id.* at *1 (citing Wright & Miller, Fed. Prac. and Proc. § 2388 (2d ed. 2006)).

### 1. Prejudice

Penn National's primary argument for bifurcation is that discovery on the bad-faith claim will include the claims file, which contains attorney-client and work-product privileged communications. (*Id.* at 9.) It argues that discovery of the claims file "would be prejudicial to Penn National and hinder its defense of the breach of contract claim." (*Id.* at 9.) It further argues that disclosure of privileged documents will reveal the legal theories, impressions, and strategies that Penn National will use to defend against Plaintiff's breach of contract and declaratory judgment claims" and would "likewise reveal Penn National's counsel's unfettered legal assessment and thought process on the viability of the strategies on the breach of contract and declaratory judgment claims." (*Id.* at 13.)

Penn National relies on Ohio cases *Boone*, 744 N.E.2d 154, and *Garg v. State Auto. Mut. Ins. Co.*, 800 N.E.2d 757 (Ohio Ct. App. Nov. 7, 2003). *Boone* is the seminal case on bifurcation in bad-faith cases; it has been cited by Ohio federal courts in decisions granting bifurcation and denying bifurcation. *Compare Woods*, 2010 WL 1032018, at *2 *with RLI Ins. Co. v. Fifth Third Bankcorp*, No. 1:14-CV-802, 2016 WL 8201161, at *3 (S.D. Ohio July 27, 2016). In *Boone*, the Ohio Supreme Court thoroughly analyzed individual documents that had been submitted to the trial court *in camera*. *Boone*, 744 N.E.2d at 159. The court ultimately permitted the insured to discover privileged information created before coverage was denied, while denying discovery of privileged documents created after coverage was denied. *Id.* The court also made explicit that trial courts have discretion to stay discovery on bad-faith claims if discovery of privileged materials would prejudice the insurer's ability to defend itself on the underlying coverage claims. *Id.* at 158.

Following *Boone*, an Ohio appellate court in *Garg* was likewise presented with specific claims-file documents that the insurer sought to shield from discovery. *Garg*, 800 N.E.2d at 763. Relying on *Boone*, the court in *Garg* held that the trial court properly compelled discovery of privileged documents. *Id.* But the court in *Garg* held that trial court's failure to grant the insurer's motion to bifurcate the bad-faith claim and stay discovery until the underlying claims were resolved was "grossly prejudicial" to the insurer. *Id.* The court reasoned that the specific documents at issue were "highly relevant to [the insurer's] defense of the breach-of-contract and unfair-claims-practices claims" and would "unquestionably impact" its ability to defend against those claims. *Id.* at 764; *see also Ferro Corp. v. Cont'l Cas. Co.*, No. 1:06CV1955, 2008 WL 5705575, at *3 (N.D. Ohio Jan. 7, 2008) (citing *Garg* and holding that, after a "review *in camera*

14

of the documents submitted by Defendants ... the unique facts of this case justify bifurcation of the bad faith claim, and a stay of discovery on that issue.").

Penn National claims that, like the insurer in *Garg*, it would suffer unfair prejudice if it were forced to hand over its claims file to Bonasera while still defending the coverage claims. However, unlike the insurer in *Garg*, Penn National has not made a "specific showing" of how it will be prejudiced if discovery is permitted on the bad-faith claim. *Woods*, 2010 WL 1032018, at *3. Penn National's assertions of prejudice lack "the specificity and particularity necessary to sustain their burden of proof." *Terra Jennings, et al. v. Allstate Vehicle and Property Ins. Co., et al.*, No. 1:20-CV-464, 2020 WL 7046890, at *3 (S.D. Ohio Dec. 1, 2020). In other words, Penn National cannot meet its burden merely by stating that it will be prejudiced—it must present specific evidence to support that assertion. *See Penn-Starr Ins. Co. v. Barr Bros. Plastering Co.*, No. 2:10-CV-00587, 2011 WL 1256623, at *3 (S.D. Ohio Mar. 31, 2011); *Excel Direct, Inc. v. Nautilus Ins. Co.*, No. 2:16-CV-446, 2017 WL 127480, at *2 (S.D. Ohio Jan. 13, 2017); *see also Woods*, 2010 WL 1032018, at *3 ("State Farm argues that the resulting disclosure of otherwise privileged information will give the plaintiffs insight into the legal theories and strategies it may use to defend the breach of contract claim and is therefore certain to result in significant prejudice. State Farm, however, does not offer any specifics as to how it will be prejudiced.").

## 2. Judicial Economy

Penn National also argues that bifurcation is warranted because it would "be conducive to judicial economy and the conservation of resources[.]" (Def. Mot. J. on Pleadings at 15.) It claims that "[i]f Plaintiff fails to prevail on the breach of contract or declaratory judgment actions, there will be no need to litigate the bad faith claim" because "the bad faith claim is dependent on coverage under the policy." (*Id.*) It also asserts that bifurcation is necessary because presenting

both the bad-faith claim and the breach of contract claim to the jury simultaneously would confuse the issues for the jury to decide.  The Court disagrees.

Nothing suggests that the jury would be confused by hearing the bad-faith claim alongside the other claims.  Any confusion will be alleviated through proper jury instructions.  *See United States v. Bradley*, 917 F.3d 493, 508 (6th Cir. 2019) (citation omitted) ("[J]urors are presumed to follow the trial court's instructions.").  Further, Penn National cannot meet its burden by relying "on the mere possibility that resolution of the coverage issue may preclude plaintiff's bad-faith claim."  *Woods*, 2010 WL 1032018, at *3 (citing *General Electric Credit Union*, 2009 U.S. Dist. LEXIS 96085, at *15).  Penn National has not shown that bifurcation of the bad-faith claim will "avoid prejudice," or "expedite and economize[.]"  Fed. R. Civ. P. 42(b).  If anything, staying discovery and holding separate trials would protract the litigation and increase costs for both sides.

As discovery proceeds, to the extent Bonasera seeks privileged documents, Penn National may challenge such requests pursuant to Fed. R. Civ. P. 26 and S.D. Ohio Civ. R. 37.1.  *See Penn-Starr Ins. Co.*, 2011 WL 1256623, at *3 (citing *Steinberger v. State Farm Auto. Ins.*, No. 3:10–cv–015, 2010 WL 3603791, at *4 (S.D. Ohio Sept.9, 2010) ("Under Fed. R. Civ. P. 26(b)(5), Defendants may, in their response to discovery requests, expressly claim the privilege as to certain identified documents or information and describe in sufficient detail to permit assessment of the claim, first by opposing counsel and then, if necessary, by the Court.").  A blanket privilege objection to the entire claims file will not suffice to show prejudice.  If necessary, Penn National may request *in camera* review of specific documents it claims are privileged.  Because privileged documents are discoverable on bad-faith claims, Penn National must show not only that the documents are privileged, but that they also hinder its ability to defend the other claims against it.  *See Garg*, 800 N.E.2d at 763 ("Under *Boone*, neither attorney-client privilege nor the work-product

doctrine protects materials in a claims file, created prior to the denial of the claim, that may cast light on whether the insurer acted in bad faith in handling an insured's claim."). If, after an *in camera* review, the Court determines that discovery on the bad-faith claim will prejudice Penn National's defense in this case, then Bonasera and Penn National may jointly ask for bifurcation or Bonasera may choose to litigate his claim without the prejudicial privileged material. As for now, Defendant's request for bifurcation and stay of the bad-faith claim is denied.

## B. Bifurcation of Punitive Damages Phase

Penn National also asks the Court to bifurcate the punitive damages phase of the trial. The parties initially dispute whether bifurcation of the punitive damages phase is controlled by Ohio law or Rule 42(b). Penn National argues that Ohio Revised Code § 2315.21 is directly on point and makes bifurcation mandatory in this case. (Def.'s Mot. J. on Pleadings at 7.) That statute mandates that, in a tort action tried to a jury, the compensatory and punitive damages stage "shall be bifurcated" "upon the motion of any party[.]" Ohio Rev. Code § 2315.21(B).

Initially, the Court notes that that Ohio Revised Code § 2315.21 is not applicable here. That statute only forbids "evidence that relates *solely* to the issue of whether the plaintiff is entitled to recover punitive or exemplary damages" during the compensatory damages phase. *Id.* § 2315(B)(1)(a) (emphasis added). As Bonasera points out, the evidence of Penn National's conduct relevant to the punitive damages standard is the same evidence relevant to determining liability and compensatory damages on the bad-faith claim. Even if the statute did apply, it is displaced by Rule 42(b). Under the *Erie* doctrine, a federal court sitting in diversity applies "the substantive law of the forum state and federal procedural law." *Biegas v. Quickway Carriers*, Inc., 573 F.3d 365, 374 (6th Cir. 2009) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). When a Federal Rule of Civil Procedure is in "direct collision" with state law, the Federal Rule controls if its scope

is "sufficiently broad to control the issue before the Court." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 749 (1980) (citing *Hanna v. Plumer*, 380 U.S. 460, 470 (1965)). So long as the Federal Rule does not run afoul of the Rules Enabling Act—that is, so long as it really "regulates procedure" and does not "abridge, enlarge or modify any substantive right"—the federal court applies the Federal Rule instead the conflicting state law, even if the state law is substantive. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407–09 (2010) (quoting 28 U.S.C. § 2072(b)).

In this case, Ohio Revised Code § 2315.21(B)—which *mandates* bifurcation of compensatory and punitive damages claims in Ohio tort cases upon a motion of either party—directly conflicts with Fed. R. Civ. P. 42(b). Rule 42(b) states that the district court *may* order bifurcation for "convenience, to avoid prejudice, or to expedite and economize[.]" Fed. R. Civ. P. 42(b). The "language of Rule 42(b) places the decision to bifurcate within the discretion of the district court", *Saxion v. Titan-C-Mfg., Inc.*, 86 F.3d 553, 556 (6th Cir. 1996), unlike the text of Ohio Revised Code § 2315.21. Therefore, so long as Rule 42(b) does not violate the Rules Enabling Act, it will control bifurcation over the Ohio statute.

Rule 42(b) is a valid procedural rule and therefore controls a bifurcation analysis in federal court despite the conflicting Ohio law. *See Wolkosky v. 21st Century Centennial Ins. Co.*, No. 2:10-CV-439, 2010 WL 2788676, at *3 (S.D. Ohio July 14, 2010) ("This conclusion accords with 'ample precedent' that federal law should govern bifurcation in diversity cases."); *Tuttle v. Sears, Roebuck & Co.*, No. 1:08 CV 333, 2009 WL 2916894, at *2 (N.D. Ohio Sept. 4, 2009) ("the Court retains its discretion over the issue of bifurcation as granted under Rule 42(b), and the mandatory language of O.R.C § 2315.21 does not apply."); *Patel Family Tr. v. AMCO Ins. Co.*, No. 2:11-CV-1003, 2012 WL 2883726, at *1 (S.D. Ohio July 13, 2012) ("the question of whether bifurcation is

appropriate is governed by *federal* law under the teachings of *Erie R.R. Co. v. Tompkins*"); *but see Maxey v. State Farm Fire & Cas. Co.*, 569 F. Supp. 2d 720 (S.D. Ohio 2008) (applying Ohio Rev. Code § 2315.12 in a case where the plaintiff did not request application of the Federal Rules); *Columbia Gas Transmission Corp. v. Interden Indus., Inc.*, No. 1:08 CV 1493, 2010 WL 11664995, at *1 (N.D. Ohio May 13, 2010) (discussing *Maxey* and finding that the case was not persuasive because the court did not address *Erie* or explain its reasoning).

Furthermore, Rule 42(b) controls despite the Ohio Supreme Court's decision in *Havel v. Villa St. Joseph*, 963 N.E.2d 1270 (Ohio 2012) holding that Section 2315.21(B) of the Ohio Revised Code created a substantive right. "Just because the Ohio Supreme Court has interpreted" this statute "to provide a 'substantive' right to bifurcation does not mean that a federal court is bound by the characterization. A state's characterization of its own rule as 'substantive' instead of 'procedural' must 'yield to the strong presumptive validity of the properly promulgated federal procedural rule, which will be upheld as controlling the procedure in the federal court.'" *Patel Family Tr.*, 2012 WL 2883726, at *2 (citation omitted).

As a matter of standard trial procedure, this Court will bifurcate evidence admissible only for purposes of punitive damages from the compensatory damages phase. However, as noted above, the evidence of Penn National's alleged bad faith relevant to proving liability and compensatory damages will overlap with evidence relevant to the punitive damages standard. Thus, should the bad-faith claim proceed to trial, it will proceed in two phases. In the first phase, the jurors will hear all evidence, except for evidence only admissible for determining punitive damages. If the jurors find Penn National liable and indicate by interrogatory that the standard for punitive damages has been met, the trial will proceed to the second phase. In the second phase,

the jurors will be permitted to hear evidence that is admissible only as to punitive damages, such as Penn National's financial condition.

Accordingly, the Court grants in part and denies in part Penn National's alternative motion to bifurcate and stay. Specifically, Penn National's motion is granted only as to bifurcation of the punitive damages phase as described above, which is the Court's routine procedure for trying a claim for punitive damages. Discovery on Bonasera's bad faith and punitive damages claims may proceed.

## IV. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court next addresses Bonasera's Motion for Partial Summary Judgment. (Pl.'s Mot. Summ. J., ECF No. 58.) Bonasera moves for summary judgment on the issue of whether Alaina Steele was "occupying" the truck at the time of the accident and thus was an insured under the policy's underinsured motorist provision. (*Id.*)

### A. Standard

A party may move for summary judgment on all or part of a claim. Fed. R. Civ. P. 56(a). Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is

a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts."). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Hamad v. Woodcrest Condo. Ass'n.*, 328 F.3d 224, 234–35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52).

### B. Analysis

Bonasera moves for partial summary judgment resolving whether Alaina Steele, the decedent, was "occupying" the truck at the time of the accident. (Pl.'s Mot. Summ. J. at 9.) Penn National initially denied insurance coverage to Alaina on the basis that she was not "occupying" the truck at the time of the accident under the terms of the policy and was therefore not an insured. (*See* Penn National's Answer to Interrogatory No. 10, ECF No. 58-3.) Bonasera argues that the undisputed facts show that Steele was "occupying" a "covered motor vehicle" and is therefore entitled to underinsured motorist coverage under the policy issued by Penn National to W.D. Wright. (Pl.'s Mot. Summ. J. at 15.)

Penn National responds that Bonasera "has taken an incorrect position" regarding whether Alaina is entitled to coverage. (Def.'s Response to Mot. Summ. J. at 5, ECF No. 65.) After

Bonasera filed the instant motion for partial summary judgment, Penn National supplemented its responses to Bonasera's first set of interrogatories and indicated that, in addition to its conclusion that Alaina was not occupying the vehicle, it also denied coverage because she was not "legally entitled" to recover under a comparative negligence theory. (Def.'s Response at 13; Abshier Aff., Ex 1, Answer to Interrogatory No. 10, ECF No. 65-1.) Thus, Penn National argues that "even if the Court finds that Alaina Steele is an insured under the subject policy, that does not mean there is underinsured/uninsured coverage for this subject accident." (Def.'s Response at 13.) It argues that there are genuine disputes of fact precluding summary judgment because a jury could find that Alaina was more than 50% at fault for the accident, which would render her not "legally entitled" to recover under the terms of the policy. (*Id.*) It also argues that there are genuine disputes of fact regarding whether Alaina was "occupying" the vehicle at the time of the accident. (*Id.* at 16.)

As an initial matter, Penn National's comparative negligence argument exceeds the scope of Bonasera's motion for partial summary judgment. While Alaina Steele's alleged comparative negligence is relevant to whether she is entitled to recover under the policy, it is not relevant to whether she qualifies as an insured. Bonasera's motion only pertains to the limited issue of whether Alaina was "occupying" a "covered motor vehicle" under the terms of the policy. In other words, Bonasera has only moved for summary judgment on one element of his claims against Penn National; he has not moved for summary judgment on any of the claims as a whole.

The sole disputed issue on this motion is whether the Alaina Steele was "occupying" the vehicle at the time of the accident as that term is defined in the insurance policy. The parties do not dispute that the policy issued to W.D. Wright by Penn National provided underinsured motorists coverage for the 2017 Chevy Silverado that Alaina was using on the day of the accident. (Dillard Aff., Ex. B at PAGEID # 2504, 2559, ECF No. 58-2.) The policy specifies that Penn

22

National would "pay all sums the 'insured' is legally entitled to recover as compensatory damages from the owner or driver of an 'uninsured motor vehicle'." (*Id.*)  The policy defines "Insured" as, among other things: "Anyone else 'occupying' a covered 'motor vehicle'... ." (*Id.* at PAGEID # 2560.)  That leaves whether Alaina qualifies as an "Insured" up to whether she was "occupying" the truck at the time of the accident.  "'Occupying' means in, upon, getting in, on, out or off." (*Id.* at PAGEID # 2562.)

The interpretation of a contract, such as an insurance policy, is a matter of law.  *Uebelacker v. Cincom Sys., Inc.*, 549 N.E.2d 1210, 1215 (Ohio Ct. App. Dec. 28, 1988).  "Courts must give common words their ordinary meaning unless manifest absurdity would result or some other meaning is clearly evidenced from the face or overall contents of the written instrument." *Willis v. Gall*, 2015-Ohio-1696, ¶ 12 (citation omitted).  "If a contract is clear and unambiguous, the court need not go beyond the plain language of the agreement to determine the parties' rights and obligations; instead, the court must give effect to the agreement's express terms." *Id.* (citing *Uebelacker*, 549 N.E.2d at 1215).  But if an insurance contract is ambiguous, the court must construe it "in favor of the insured against the insurer." *Id.* (citing *Dominish v. Nationwide Ins. Co.*, 953 N.E.2d 820, 822 (Ohio 2011)).

"Although the term 'occupying' as defined in the insurance contract may not seem ambiguous on its face, it often becomes ambiguous when determining whether insurance coverage should be extended in certain factual circumstances." *Etter v. Travelers Ins. Cos.*, 657 N.E.2d 298, 300 (Ohio Ct. App. Mar. 31, 1995).  In interpreting "occupying" in underinsured motorist provisions, "the determination of whether a vehicle was occupied by the claimant at the time of an accident should take into account the immediate relationship the claimant had to the vehicle, within a reasonable geographic area." *Joins v. Bonner*, 504 N.E.2d 61, 63–64 (Ohio 1986).  In *Joins*, a

child was struck in the middle of a cross walk after exiting the insured vehicle to reach his babysitter's house across the street. *Id.* at 62. The insurance company denied coverage because the child was not "occupying" the vehicle. *Id.* The policy defined "occupying" as "in or upon or entering into or alighting from." *Id.* The court found that the child was "occupying" the vehicle when he was struck because he was within a "reasonable geographic area" of the vehicle and therefore was "in the process of 'alighting from' it." *Id.* at 64.

To summarize, *Joins* identified two requirements for finding that a claimant was "occupying" the insured vehicle: (1) the insured was within a reasonable geographic area of the vehicle; and (2) the insured "had a sufficient relationship" to vehicle at the time of the accident. *Etter*, 657 N.E.2d at 302. The "sufficient relationship" requirement looks to whether the claimants' conduct was "foreseeably identifiable" with the normal use of the vehicle. *Id.* at 301 (citation omitted). These factors are the "universal standard for determining whether a person is 'occupying' a vehicle" in Ohio. *Etter*, 657 N.E.2d at 301 (claimant was "occupying"[1] vehicle when he was 20 to 30 feet away from the vehicle and was helping another motorist push a car out of the median while the claimant waited for a tow truck for his car); *see also Martens v. Auto-Owners Ins. Co.*, 2019-Ohio-5423, 2019 WL 7369244, at *3–4 (claimant was "occupying"[2] vehicle when standing "mere feet" from his employer's insured truck while talking to his boss after unloading work equipment from an attached trailer to perform driveway sealing services); *Anderson v. Nationwide Mut. Fire Ins. Co.*, 2005-Ohio-3043, 2005 WL 1415185, at *1 (claimant was "occupying"[3] employer's van when he was struck by an underinsured motorist while surveying for an engineering firm roughly 20 to 25 feet from where the van was parked).

---

[1] "Occupying" in *Etter* meant "in, upon, getting in, on, out, or off." *Id.* at 300.
[2] "Occupying" in *Martens* meant "being in or on an automobile as a passenger or operator, or being engaged in the immediate acts of entering, boarding or alighting from an automobile." *Id.* at *3.
[3] "Occupying" in *Anderson* meant "in, upon, getting in, on, out or off." *Id.* at *2.

When applying these factors, "reasonable geographic distance is not measured as a matter of law in feet." *Disbennet v. Utica Nat. Ins. Grp.*, 2003-Ohio-2013, 2003 WL 1906748, at *3.[4] In *Disbennet*, a man was performing surveying work in the middle of the road 80 feet from his employer's parked vehicle when he was struck by a car and killed. *Id.* at *1. The insurance company denied underinsured motorist coverage and the man's wife sued. *Id.* The trial court concluded as a matter of law that the man was an "insured" under the policy. *Id.* On appeal, the court affirmed, holding that "reasonable minds can only conclude that [the man] was within a reasonable geographic distance to the insured vehicle and that he was engaged in an activity that was foreseeably identifiable with the use of the insured vehicle at the time of the accident." *Id.* at *3. Though the man had been 80 feet from the insured vehicle when he was struck, the "measure of feet is only one factor to be considered when determining whether the issue is a question of fact for the jury or may be determined as a matter of law." *Id.*

The court in *Disbennet* relied *State Farm Mut. Auto. Ins. Co. v. Cincinnati Ins. Co.*, No. 62930, 1993 WL 215450 (Ohio Ct. App. June 17, 1993).[5] In *State Farm*, two men were driving a truck with several cases of two-liter soda bottles in the back when two cases fell off and landed on the highway. *Id.* at *1. The driver pulled the truck over and the passenger exited the vehicle to retrieve the bottles from the highway. *Id.* The passenger who went to retrieve the bottles walked back "100–110 feet" from the pulled-over truck when he was struck by a passing vehicle. *Id.* The court held as a matter of law that the man was "occupying" the vehicle for purposes of underinsured motorist coverage because the man's "express purpose for temporarily leaving the vehicle was to retrieve these cases of pop and return them to the truck in order that he and [the driver] might continue their trip." *Id.* at *5.

---

[4] The policy's definition of "occupying" was not provided by the court in *Disbennet*.

[5] "Occupying" in *State Farm* meant "in, upon, getting in, on, out or off." *Id.* at *2.

In this case, both parties utilize the *Joins* factors. Applying those factors, the Court concludes as a matter of law that Alaina was "occupying" the covered motor vehicle at the time she was struck by Jeep. Under the first *Joins* factor, Alaina was within the reasonable geographic area of the truck when she was hit by the Jeep. *See Joins*, 504 N.E.2d at 63–64. It is undisputed that, just prior to the Jeep coming over the hill, Alaina was standing right next to the truck's passenger side taillight. (Steele Dep. at 45:14, 47:7–9.) Immediately after Alaina placed the sign in the truck, Samantha heard a Jeep coming over the hill and turned to witness the Jeep approach their location at "approximately 65 to 75 miles per hour." (Steele Aff. ¶ 71; Steele Dep. 47:12–13.) Samantha and Alaina then both fled as the Jeep approached; Alaina ran away from the passenger side of the truck toward the ditch. (Steele Aff. ¶ 72; Steele Dep. at 47:12–22.) The fact that Alaina was ultimately struck and killed by the Jeep in the ditch next to the truck means that there can be no genuine dispute of fact regarding whether Alaina was within the reasonable geographic area of the insured vehicle.

Under the second *Joins* factor, Alaina had a sufficient relationship with the insured truck. *See Joins*, 504 N.E.2d at 63–64. She had been using the truck to drive down the road and retrieve signs as part of her job duties as a flagger with Wright Brothers. *See, e.g., Willis*, 31 N.E.3d at 685 (claimant was "occupying"[6] vehicle when he was struck by a vehicle while feeding branches into a wood chipper attached to the insured truck after "repeatedly enter[ing] and exit[ing] the truck" to travel to different sets of debris along the roadway). Alaina's use of the truck was therefore "foreseeably identifiable" with the normal use of the vehicle. *Etter*, 657 N.E.2d at 301. Penn National does not dispute this point.

---

[6] "Occupying" in *Willis* meant "being in or on an automobile as a passenger or operator, or being engaged in the immediate acts of entering, boarding or alighting from an automobile." *Id.* at 680.

Penn National argues that "reasonable geographic area" is a question for the jury because Alaina's precise distance from the truck when she was struck by the Jeep is unknown. But "reasonable geographic distance is not measured as a matter of law in feet." *Disbennet*, 2003 WL 1906748 at *3. Penn National does not dispute that Alaina was struck and killed by the Jeep in the ditch next to the truck. When the Jeep came speeding over the hill and set the accident in motion, Alaina was standing much closer to the vehicle—right next to the passenger taillight— than the passenger in *State Farm* who was 100–110 feet from his truck retrieving soda bottles, or the surveyor in *Disbennet* who was working 80 feet from his parked vehicle. And, like the man in *State Farm*, Alaina's "purpose for temporarily leaving the vehicle" was to retrieve a sign from the road and return to the truck. *State Farm*, 1993 WL 215450, at *5. This was the very purpose for which Alaina and Samantha were issued the truck by Wright Brothers. (*See* Steele Aff. ¶¶ 36, 58– 59.) Thus, even though Alaina was fleeing away from the truck when she was struck, "reasonable minds can only conclude that" Alaina "was within a reasonable geographic distance to the insured vehicle and that [she] was engaged in an activity that was foreseeably identifiable with the use of the insured vehicle at the time of the accident." *Id.*

Accordingly, the Court concludes as a matter of law that Alaina Steele was "occupying" the 2017 Chevy Silverado at the time of the accident. Therefore, the Court grants Bonasera's motion for partial summary judgment.

### V. DEFENDANT'S RULE 56(d) MOTION FOR ADDITIONAL TIME

Penn National has also asked for more time to respond to Bonasera's motion under Fed. R. Civ. P. 56(d). In support, Penn National submits that the parties have completed only one deposition. (Def.'s Response at 3.) Penn National further submits that it will depose several witnesses with relevant information. (*Id.*) Most of these witnesses go toward the issue of

comparative negligence, which, as discussed above, is not relevant to Bonasera's motion for partial summary judgment on the issue of whether Alaina Steele was "occupying" the truck. Penn National also wishes to depose the deputy who conducted the accident investigation. (*Id.*) It argues that his testimony would be relevant to the "occupying" question. (*Id.*) While the deputy's testimony could provide a more precise estimate of the distance between Alaina and the truck at the time of the accident, the deputy's testimony could not create a triable issue on whether Alaina was within a reasonable geographic area of the truck. "[R]easonable geographic distance is not measured as a matter of law in feet[.]" *Disbennet*, 2003 WL 1906748 at *3; (*See* Steele Dep. at 47:7–22, 196:1–197:3.) Therefore, Penn National's Motion for Additional Time Under Rule 56(d) is denied.

## VI. CONCLUSION

For the reasons stated above,

(1) The Court **DENIES** Defendant Penn National's Motion for Judgment on the Pleadings. (ECF No. 44.)

(2) The Court **GRANTS IN PART** and **DENIES IN PART** Defendant Penn National's Alternative Motion to Bifurcate and Stay. (ECF No. 44.)

(3) The Court **GRANTS** Plaintiff Thomas J. Bonasera's Motion for Partial Summary Judgment. (ECF No. 58.)

(4) The Court **DENIES** Penn National's Motion for Additional Time to File a Response to Bonasera's Motion for Summary Judgment. (ECF No. 65.)

This case is to remain open.

**IT IS SO ORDERED.**

_____          _____
2-9-2021
**DATE**                                      **EDMUND A. SARGUS, JR.**
                                              **UNITED STATES DISTRICT JUDGE**